61 178
85 194
61 178
92 353
61 178
e103 298
61 178
104 552

## State of Maine *vs.* Louis H. F. Wagner.

*Evidence in capital cases.*

All parts of the State are included within the body of one or another of the several counties into which the State is divided.

When murder has been done in an unincorporated place, publicly and commonly known by name, in any one of these counties, the venue is well laid, and the place sufficiently described, if the crime charged in the indictment as having been committed at (insert the name by which the place is commonly known) a place within the county of (name of county) aforesaid, in the absence of anything tending to show that the prisoner would be embarrassed in the preparation of his defense for want of a more particular description.

When there is no controversy as to the precise spot on the face of the earth where the crime was committed, and it appears by ancient charters, legislative enactments, and judicial records that the political authorities and courts have heretofore claimed and exercised jurisdiction over the locality in question, the question of jurisdiction is one of law—for the court, and the defendant cannot in any stage or form of pleading rightfully claim to have it submitted to the jury as one of fact, for their determination.

Upon such a question the presiding judge in addition to the matters of which he will take judicial notice, such as legislative enactments, ancient charters, and geographical position, may refresh his recollection and guide his judgment by reference to the records of the courts in the county where he sits, general histories of deceased authors of established reputation, and the records of the census of the inhabitants of the county taken under the laws of the United States by its officers.

It is competent for the Assistant United States Marshal who took the census for the district, and made the return to the office of the clerk of the courts for the county, when the record does not show the specific locality where the individuals enumerated resided, to testify as to their place of residence.

When the political authorities of a State have actually claimed and exercised jurisdiction over a particular locality, the courts of the State are thereby concluded, and will respect such decision, and act accordingly without questioning the validity of such claim.

The prisoner was not wronged by the instructions given in this case that proof that the crime was committed on the island called Smutty Nose is equivalent to proof that it was committed within the county of York, and would make the crime properly cognizable by the court sitting in this county. That instruction was correct.

The outcries of a person deceased made during the perpetration of the assault which results in death, or upon the approach of the assailant, are competent evidence upon the trial of a party charged with the murder of such person, and may be considered by the jury with other circumstances and testimony upon the question of the identity of the accused.

The outcries of another person who was murdered by the same party a few minutes previously during the perpetration of one and the same burglary, but on another part of the premises, are admissible under like circumstances for the same purposes upon such trial.

Such exclamations are competent as part of the *res gestæ*.

Moreover their admission may be distinctly justified for the same reasons which are held to justify the admission of dying declarations.

The contents of the prisoner's pockets found when he is arrested may be put in evidence when there is testimony tending to show that they or a portion of them came from the recent possession of the deceased or from the locality of the crime.

Articles which a witness identifies as the property of the prisoner, and in his possession shortly before the crime was committed, when found shortly after its perpetration, at the house where the crime was committed, may be offered in evidence.

ON EXCEPTIONS.

INDICTMENT for the murder of Anethe M. Christensen, on the sixth day of March, 1872, "at an island called 'Smutty Nose,' a place within the county of York." This island is one of the cluster of islets known as the Isles of Shoals; part of the group lying in Maine, and part in New Hampshire. The indictment stated the place where the crime was committed in the language above quoted, and the prisoner's counsel moved to quash the indictment on account of the asserted indefiniteness of this allegation; and, subsequently to the rendition of a verdict of guilty, moved in arrest of judgment for the same reason. The presiding judge overruled these motions and the respondent alleged exceptions to these and other rulings of the court, as fully appears by the opinion.

The respondent denied that the spot where the offense was committed was within the body of the county of York and claimed to have this issue passed upon by the jury as a question of fact; but this claim was not allowed, the presiding justice determining it, as matter for the exclusive cognizance of the court, by reference to histories, ancient records and charters, and other documentary evidence, as well as by oral testimony. The defendant objected to the admission of a large portion of this evidence, as appears by the opinion. The house at which the murder was committed was the only one on that island then inhabited, and was on that night occu-

pied only by three women, viz.: Mrs. Mary S. Hontvet, wife of John C. Hontvet, Karen Christensen, sister to Mrs. Hontvet, and Anethe M. Christensen, wife of Evan Christensen, who was brother to Karen and Mrs. Hontvet. Karen was sleeping upon a lounge in the kitchen directly under a bracket upon which stood a clock. The first blow aimed at her knocked down and stopped the clock at seven minutes past one in the morning; thus, as Choate once said: "Though the dial spoke not, it gave most manifest sign, and pointed to the stroke of murder." At this hour of that night the moon was shining brightly, but its beams were excluded from the kitchen by the curtains being let down, so that when Karen awakened from sleep, confused by the assault, she did not recognize her assailant, but called out, "John is scaring me; John scared me," evidently supposing it to be John Hontvet. Anethe, alarmed by the outcry, jumped from the bedroom window and was met by the prisoner near the end of the house, he having passed out after beating Karen, probably having heard the noise made by raising the window. As he approached her Anethe discovered who her assailant was, and called out several times, "Louis, Louis, Louis." Mrs. Hontvet testified to these exclamations of Anethe and Karen, her statement of them being admitted against the defendant's objection; one argument brought to sustain the objection being that it might be taken as proof of a defendant's identity with the murderer, and given too great weight by a jury, though made under circumstances that were not favorable to accuracy of knowledge or statement on the part of the exclaimer. Karen had a silver half-dollar, some coppers, and a button with a peculiarly corrugated edge in her pocket the day before her death; similar coins and just such a button were found in Wagner's pocket when arrested; but to the admission of proof of this fact the prisoner's counsel objected. A pencil with the end marked in a particular way was found on the entry floor of the house the afternoon of the day of the murder; and a witness testified, against defendant's objection, to having seen a pencil so marked in Wagner's possession a short time before the murder.

*R. P. Tapley*, and *Max Fischacher*, for respondent.

Jurisdiction, like all other facts of the case, is for the jury; at any rate, the testimony adduced to establish it was incompetent. *U. S.* v. *Jackalow*, 1 Black, 484.

*Geo. C. Yeaton*, county attorney, and *H. M. Plaisted*, attorney-general, for the State.

Barrows, J. The prisoner denies the jurisdiction of the court in which his trial took place, and complains in several respects of the manner in which the presiding judge dealt with the questions which he sought to raise touching that branch of his defense.

I. He made a motion in the outset to quash the indictment, alleging that the place where the murder was committed is not therein set forth with sufficient distinctness to enable him to plead properly. The motion was overruled. After verdict he filed a motion in arrest of judgment for substantially the same alleged cause.

This motion also was overruled, and to this he excepts.

The allegation in the indictment is that the crime was committed "at an island called 'Smutty Nose,' a place within the county of York aforesaid." It is insisted for the prisoner that such an allegation fails to demonstrate York County as the proper venue. He suggests no amendment by which it could be made more certain, and still conform to facts.

We do not see how in the nature of things the allegation could be made more precise without tedious and useless prolixity.

We recognize in its fullest reasonable extent the substantial right of a party charged with crime to have the accusation against him formally, fully, and precisely set forth, with such circumstances of place and time as shall not only indicate the jurisdiction of the court before which he is called to plead, but shall also enable him to prepare his defense understandingly. We cannot see that this right has been infringed in the indictment before us.

The objection seems to be founded upon the idea that Smutty Nose Island is not a place which has been recognized by that name

in any statute of the State, and that, therefore, the allegation that it is in the county of York cannot be verified by reference to the public laws, and hence arises a necessity for further and extrinsic allegations. But the conclusion does not follow from the premises. The averment is distinct and positive that the crime was committed at a place within the county of York, and that place is identified with a particularity even greater than it would be likely to be if the island belonged to any of the municipal subdivisions of the State, existing by virtue of specific statutory enactments. While an act of incorporation, had any such existed, might have furnished a more ready means of verifying the accuracy of the averment, it is not perceived how the want of it can make any extrinsic allegations necessary, nor how they would subserve any useful purpose. The waves of the sea define the place as distinctly as an Act of the Legislature could possibly do, and there are abundant means, as we shall hereafter see, to verify the allegation which is essential to the maintenance of the jurisdiction.

In Brown's case, tried before the full court of this State in 1837, the crime was alleged to have been committed "at an unincorporated place in said county (of Cumberland) called the Eighty Rod Strip, between Poland in said county and Raymond in said county." The accused had been described in the indictment as "Jesse Brown of Poland in said county, Esquire, otherwise called Jesse Brown, of an unincorporated place in said county called the Eighty Rod Strip," etc. There seems to have been a doubt whether the place where the crime was alleged to have been committed was or was not a part of the town of Poland. But apparently the court considered the allegation that it was within the county sufficient, so far as the laying of the venue was concerned. And why not?

In Kirby's case, tried in Washington county, at the October Term, 1872, the crime was charged to have been committed "at an unincorporated place called Forest City, in the county of Washington." The name Forest City had been applied to a little settlement which had grown up in the wilderness about a large tannery; and the dwelling-houses were partly in the county of Wash-

ington and partly in a British Province. Yet able and vigilant counsel made no objection to the sufficiency of the allegation, and no practical difficulty jeopardizing any of the defendant's rights was developed in the trial.

We think the mode of allegation adopted in the case at bar appropriate in all cases where the place is unincorporated, but has nevertheless a name and limits known and recognized by the people of the county; and that it is sufficient to guard well all the substantial rights of the accused. The motion in arrest was properly overruled.

II. The prisoner complains of the instruction which took from the jury the decision of the question, whether Smutty Nose Island is in the county of York. The instruction was, "that proof that the crime was committed on Smutty Nose Island is equivalent to proof that it was committed in the county of York, and would make the crime properly cognizable by the court sitting in this county."

The instruction was prefaced by a partial statement of the reasons upon which it was based, and it may not be amiss to recur to them.

Before stating the legal proposition above recited the presiding judge remarked as follows: "It is incumbent on the government to prove the commission of the crime in the county of York. The allegation is that it was committed on an island called Smutty Nose in the county of York. All the testimony in the case goes to show that that island was the scene of the transaction. It is a piece of territory of definite limits, known by name, and over which the political authorities of this State and their predecessors have exercised jurisdiction. There is no dispute as to the precise spot upon the face of the earth where the crime was committed if committed at all. It was on the island called Smutty Nose and at the house of John C. Hontvet. I see no evidence tending to show that a part of the island is in one jurisdiction, and a part in another; the whole or none of the island would seem to be in Maine and in this county."

The whole case which is before us shows that the foregoing statement was indisputably correct. The question of jurisdiction in this case turned entirely upon the construction of the ancient charters and grants, and the legal effect of the actual exercise of jurisdiction by the political authorities of this State and their predecessors, as shown by the records drawn from their archives, over the island which was the scene of the crime.

Under this condition of things the presiding judge assumed to decide the question as one of law for the court; and therein we think he did right. Neither the construction of charters or grants, nor the effect of previous acts of jurisdiction as shown by records, can be a matter for the jury to determine. The force and effect of charters, grants, and records are for the court. Wherever the question of jurisdiction depends upon their construction and effect, it is purely a question of law for the court. And in cases where the political authorities of the State have actually claimed and exercised jurisdiction over particular localities, the doctrine of the law seems to be that the courts are thereby concluded, and have only to declare the fact and govern themselves accordingly, without undertaking to pass upon the validity of such claim. *Foster & Elam* v. *Neilson*, 2 Pet. 254; *State* v. *Dunnell*, 3 R. I. 127.

How can a court of this State sitting for York county refuse the protection afforded by our laws and tribunals to the inhabitants of islands classed and reckoned by our legislature, in the apportionment of representatives to that county, as composing part of its territory and population? And with what semblance of propriety, after such legislative recognition, could the judge of such court submit it to the jury in every case that arose in a poor and sparsely populated locality, to determine whether the dwellers there should any longer receive the protection of the laws and the courts which the representatives of their predecesors may have helped to frame and establish?

Obviously, under such circumstances there is nothing for a jury to pass upon, and a party charged with crime cannot claim under any form of pleading to have such a question submitted to the jury

for determination, nor complain if his request that it should be so submitted is overruled. Such a request is merely one of those stumbling blocks in the way of justice which it is the business of the court to remove.

Nor is there anything inconsistent with the view which we have here taken in Jackalow's case, 1 Black, 484. There the crime was alleged to have been committed on board a vessel at sea—the place where she lay being the subject of doubt and testimony. The locality where she was situated was necessarily previously without occupants. No jurisdiction had ever there been exercised or claimed by the State authorities, and, therefore, it became necessary for the jury to determine not only the precise point where the offense was committed, but also whether it fell within the boundaries of the State, because there were no proceedings of the State to conclude the court, and no previous exercise of jurisdiction over the watery waste. Such a case bears no analogy to a case arising upon an island settled two hundred and fifty years ago, formerly populous and important, respecting which an abundance of jurisdictional facts appear of record among the files of the court whose jurisdiction the prisoner was denying.

Even in the absence of a distinct legislative recognition as part of our own State and of a particular county in it, we think questions whether the numerous islands along our coast lie within our borders and within county lines and are subject to the jurisdiction of our courts, are properly questions for the decision of the court, and once settled must be deemed settled forever, and not subject to the varying verdicts of successive juries whenever a person charged with crime sees fit to claim to throw in a denial of jurisdiction as a makeweight to raise a doubt in a case otherwise clear. A criminal might as well call for the opinion of the jury upon the regularity of the judge's commission, or the validity of the election of the governor by whom he was appointed. The administration of justice becomes possible only by assuming that certain things have been regularly and definitively settled and are so to remain.

The court is bound to take notice of public facts and geographi-

cal positions. *Peyroux* v. *Howard*, 7 Peters, 342, 343; *The Apollon*, 9 Wheat. 374.

In respect to all such matters, if the memory of the judge is at fault, or his information not sufficiently full and precise to induce him to act, "he resorts to such documents of reference as may be at hand and he may deem worthy of confidence." 1 Greenleaf's Evidence, § 6.

Nor does the fact that the information thus sought by the judge has been laid before him in the presence of the jury without any distinct ruling that it was designed for the court alone, give a party the right to insist that the jury shall pass upon it. We think that the presiding judge was right in holding that upon the case here disclosed, the question of jurisdiction was one of law, which he was called upon to decide for the purposes of that hearing, his decision being subject to revision by the full court on exceptions.

III. But in case it should be held that the questions arising under his denial of the jurisdiction were for the court to determine, still the prisoner complains that testimony which was legally inadmissible was let in to influence the judge's decision. An objection of that sort cannot be deemed available when the case shows that there was that before the court which was absolutely conclusive against the position taken by the prisoner. Of what consequence can it be if it turns out that some item which was received by the judge to inform his mind upon the matter in question, did not come through a legal channel and ought to have been excluded, if there still remains that which imperatively required him to hold adversely to the prisoner? The defendant cannot possibly suffer by such a mistake, if there were one.

As we have already seen by the cases above cited, the court has nothing to do but to recognize the boundaries claimed by the political authorities of the State under which it acts. Where there has been an actual claim and exercise of jurisdiction by these authorities, the courts are bound thereby. The remark of Chief Justice Marshall in *Foster* v. *Neilson*, *ubi supra*, applies also to the boundaries and courts of the different States of our Union. "A ques-

tion like this, respecting the boundaries of nations is as has been truly said more a political than a legal question; and in its discussion the courts of every country must respect the pronounced will of the Legislature."

The case discloses irrefragable evidence of the practical construction of the ancient charters and grants adopted by the political authorities of this State, and it mattered little what else was or was not offered or admitted in evidence.

But we do not wish to be understood as holding that any of the evidence received was not admissible.

We have no hesitation in declaring the admissibility of the records produced from the office of the clerk of the courts for York county. Their antiquity and genuineness were unquestionable, and they proved conclusively that the legislative act passed "att a Generall Courte of Elections held at Boston the 16th of May, 1653," and entitled "The Grant to Kittery," whereby in consideration that they had "acknowledged themselves subject to the Government of the Massachusetts Bay," and, "for the settling of Government amongst them and the Rest within the bounds of these charters," etc., it is provided, "1st, that the whole tract of land beyond the River of Piscataq, together with the Ile of Shoales within our said bounds is and shal be henceforth a County or Shire called by the name of Yorkshire," was no mere *brutum fulmen*, but was followed by the actual exercise of jurisdiction, civil and criminal, over the territory in question, to which end courts were held under the political authority of the Massachusetts Bay upon "the island called Smutty Nose," the records of which courts are preserved to this day in the proper repository of the records of York county.

The objections urged against their admissibility are that it does not appear that Yorkshire and York county are identical, nor that the jurisdiction thus exercised was legal, the question not being raised, and no adjudication having been made with regard to it so far as these records show.

The obvious answers are, 1. To the first objection. Whatever

changes have been made in the boundaries of York county or Shire must appear in subsequent legislation, an examination of which shows that the western and southern boundaries have always remained the same (with the exception of a single brief interval hereafter to be noticed), the new counties having been created from the easterly and northerly portions of Yorkshire.

See Provincial Act of 1760—establishing two new counties (Cumberland and Lincoln), in the easterly part of the county of York. Appendix to R. S., p. 943. Massachusetts Act of March 4, 1805, entitled "an Act to incorporate a part of the counties of York and Cumberland into a separate county by the name of Oxford." Appendix to R. S., p. 947.

2. To the second objection. We do not sit in judgment upon the legality of the acquisition of political and civil jurisdiction by the predecessors of our own political authorities who have received by regular course of transmission, and now hold the power once exercised by "The Government of the Massachusetts Bay" over the province of Maine. If we did, the fact that that jurisdiction was exercised unquestioned would certainly be no argument against its legality, but rather the reverse. The submission to the jurisdiction so far as the records show was universal. "It has been sometimes said," remarked Lord Ellenborough, *communis error facit jus;* but I say *communis opinio* is evidence of what the law is, not where it is an opinion merely speculative and theoretical, floating in the minds of persons, but where it has been made the groundwork and substratum of practice."

General histories of painstaking authors long since deceased, and of established reputation, like those of Williamson and Belknap, are competent evidence upon a question of this nature. No one claims them as conclusive or infallible, but carefully used as aids and guides, and accepted as true where their statements are uniform and consistent with the evidence of original records and admitted or well-known facts, they will be found of great service in arriving at a satisfactory conclusion.

The case of *Evans* v. *Getting*, 6 Car. & P. 586, which was cited

at the trial against their admission, and which seems also to be the basis of the remark in Greenleaf's Evidence, vol. 1, § 497, to the effect that in regard to the boundaries of a county they are not admissible, would be found on examination, by implication to favor the admissibility of general histories of States, like those of Williamson and Belknap. In that case it was a history of Brecknockshire that was offered to prove the boundary between that county and Glamorgan, and Alderson, B., rejected it with the remark:— "The writer of this history probably had the same interest in enlarging the boundaries of the county as any other inhabitant of it. It is not like a general history of Wales."

Counsel misapprehend the testimony of Mr. Allen, the clerk of the courts, if they suppose that the census returns were not produced from the proper repository in his custody. They were kept by him with other files pertaining to the office of the clerk of the courts, in an office in the rear of the treasurer's office, to which the clerk had a key. Mr. Safford testified without objection that he was an Assistant U. S. Marshal for Maine, and took part of the census. The law of the United States under which it was taken required the making of the returns by the marshals and their assistants in the several districts and the deposit of duplicates in the office of the clerk of the courts for the county in which the district was situated. The return was identified by the assistant marshal who made it and made the enumeration of which it was the record, and it was plainly competent to prove by him the fact that certain persons whose names were borne thereon lived upon the island of Smutty Nose—the name of the island not being given in the return, but only that of the group. It was reliable evidence that Smutty Nose Island had been recognized by officials acting under the authority of the government of the United States, as part of the State of Maine, and of the county of York; and this fact had some probative force, though not conclusive upon the court as were the acts of the political authorities of our own State.

IV. But again it is claimed that if the question of jurisdiction was for the court to decide, and the testimony received was com-

petent, still it was not established that Smutty Nose Island is within the county of York, and the presiding judge erred in so holding.

The claim will not bear examination.

Upon what was the ruling based? Besides the Legislative Acts and record evidence to which we have referred in discussing the previous points, we find that the Legislature of this State—before the progress of decay had left those of the Isles of Shoals which lie within our bounds entirely without voters—in apportioning representatives to the county of York, assigned one to "Kittery and the Isles of Shoals." Resolve of 1852, c. 448.

Nor are we left in doubt which of the Isles of Shoals were here intended. In chap. 29, Resolves of 1829, we have the report of the commissioners appointed to ascertain, survey, and mark the boundary line between the States of Maine and New Hampshire. This report, and the line marked and designated as the true boundary line of said States therein set forth, were established and confirmed by Legislative Resolves, approved Feb. 28, 1829.

This report commences with the following significant recital:

"The report of the commissioners appointed by his Majesty's order in council of February 22, 1735, and confirmed by the order of the fifth of August, 1740, having established 'that the dividing line shall run up through the mouth of Piscataqua Harbor and up the middle of the River of Newichawannoch, part of which is now called the Salmon Falls, and through the middle of the same to the farthest head thereof, &c.,' and that 'the dividing line shall part the Isles of Shoals, and run through the middle of the harbor between the Islands to the Sea on the Southerly side, &c.,' we have not deemed it necessary to commence our survey until we arrived North at the head of Salmon Falls River."

Going back to the report of the commissioners thus referred to and adopted, we find that the previously existing and well-known partition of the Isles of Shoals between the provinces of New Hampshire and Massachusetts Bay is affirmed in these terms: "And that the dividing line shall part the Isles of Shoals and run through the middle of the harbor between the islands to the sea on

the Southerly side; and that the South Westerly part of said islands shall lie in and be accounted part of the Province of New Hampshire; and that the North Easterly part thereof shall lie in and be accounted part of the Province of Massachusetts Bay; and be held and enjoyed by the said Provinces respectively in the same manner as they now do, and have heretofore held and enjoyed the same."

This division is traceable through various Ancient Charters and Grants, as will be seen by referring to the charter of 1629 to Mason; the Royal Charter of 1639 to Gorges; and the charter of William and Mary in 1691 (Ancient Charters, p. 26), in all which the north half of the Isles of Shoals is treated as belonging to the grant to Gorges and to the province of Maine, and the south half to New Hampshire; and it is to this division, based on the agreement between Mason and Gorges in 1624 for a partition of the lands granted to them jointly by the Council of Plymouth that allusion is made when the commissioners say, in 1737, that these islands shall be "held and enjoyed by the said provinces respectively in the same manner as they now do and have heretofore held and enjoyed the same."

Now, taking notice as we are bound to do of the geographical position of these islands, and of the uncontradicted testimony in the case, there is no room left for doubt that the line follows the ship channel between Star and Cedar Islands, "through the middle of the harbor between the islands to the sea on the southerly side," leaving Appledore or Hog Island and Smutty Nose still farther within the borders of Maine.

Indeed, it is not now even pretended that Smutty Nose does not lie in the "North half" or "North Easterly part" of the Isles of Shoals; but the ingenuity of counsel is directed to the substantiation of the somewhat fanciful hypothesis that even if it must be conceded that this portion of the islands has long pertained, first to the province, then to the district, and now to the State of Maine, still it never was restored to the county of York since it was ordered in 1672, that all those islands "be adjoined unto the

same county to which Star Island belongs," *i. e.* to the county of Dover and Portsmouth.

The whole group had been, previously, in 1661, "allowed to be a township called Apledoore," and to "have aequall power to regulate theire towne affaires as other townes of this jurisdiction have," by an Act of the Massachusetts General Court in which it is said that they "do lye partly in the County of Yorke, and the other parte in the jurisdiction of Dover and Portsmouth."

But it was only for a very brief interval that jurisdiction of the north half of the Isles of Shoals was withdrawn from the county of York by the Act of 1672. That Act was passed while the government of Massachusetts Bay was claiming to extend its jurisdiction over Mason's part of Laconia, as well as that of Gorges. But in July, 1679, the Massachusetts colony was notified of the king's intention to disallow this claim as to New Hampshire, and required to revoke all commissions which they had granted there, which were all declared null and void, and in September a commission for the government of New Hampshire was issued which "inhibits and restrains the jurisdiction exercised by the colony of Massachusetts over the towns of Portsmouth, Dover, Exeter, and Hampton, and all other lands extending from three miles to the Northward of the river Merrimack and of any and every part thereof to the Province of Maine."

Thus the attempted annexation was effectually annulled. The York County records show abundant subsequent evidence of the exercise of jurisdiction over the north half, which was represented in the Massachusetts General Court in 1692, by Roger Kelley and William Lakeman; and "the south half" is again particularly mentioned in the commissions for the government of New Hampshire.

But it is needless to multiply the historical proofs.

Chapter 448 of our legislative resolves, passed in 1852, assigning these islands to constitute part of one of the representative districts of York County would suffice to destroy the ingenious fabric which counsel have created. We simply follow the Legislature of

our State in declaring the north half of the Isles of Shoals, including Smutty Nose, to be a part of the county of York, as well as of the State of Maine.

V. Was there error in permitting Mrs. Hontvet to rehearse to the jury the outcries which were made by Karen and Anethe, respectively, upon the approach of the murderer?

It might perhaps be said that since Mrs. Hontvet testifies positively that the man who was there and murdered these women was Wagner, the prisoner, he cannot complain of the admission of all that was said in his presence.

It may be that it would not be unreasonable to say that inasmuch as the judge in his instructions to the jury made use of the circumstance which alone could be deemed unfavorable to the prisoner, only to caution the jury not to rely too confidently upon Mrs. Hontvet's testimony identifying Wagner on the spot, lest she might have mistaken some other person for him, because she was expecting, by reason of Anethe's exclamation, to see him, the defendant could not have been prejudiced by the testimony.

But we prefer to place its admission upon a different ground.

Looking at all the circumstances attending these outcries, and especially the fact that Anethe's recognition of the prisoner was in the open air and in the bright moonlight, we cannot doubt that what she said did have not a little weight in the minds of the jury against him upon the question of identity. We think it might legitimately be used for that purpose.

The court in Massachusetts went farther in the case of *Commonwealth* v. *McPike*, 3 Cush. 181, in admitting the statement of the injured person made shortly after the infliction of the wound, and while she was lying on the floor bleeding profusely, "that John (meaning the defendant) had stabbed her." The statement was made when the accused was not present, and the testimony was admitted against the objection of the defendant without proof that the wounded person had given up all hope of recovery so as to make it competent as a dying declaration. The statement was accompanied by a request to the witness to go for a physician, but

very clearly the sole use to which it was to be put in the trial, was to identify the defendant as the person who inflicted the injury. And the court held that "the period of time at which these acts and statements took place was so recent after the receiving of the injury as to justify the admission of the evidence as a part of the *res gestæ.*"

The testimony in the case at bar, the competency of which we are considering, was let in by the presiding judge with a similar remark. This is criticised in argument, on the ground that here was no act of the deceased which it was necessary or desirable to explain, and that declarations, to be competent as part of the *res gestæ*, must accompany such an act on the part of the declarant.

It is a matter of very little consequence whether a reason assigned by a judge at *nisi prius* for his ruling is or is not technically accurate and sound. Doubtless what may be denominated a sound legal instinct produces many correct rulings upon the admissibility of testimony when the judge who made them might not be ready to state the true reason with precision, or even with a perfect comprehension of the proper grounds upon which the admission or exclusion should be placed. Compendious phrases, used in similar connections, are very apt to suggest themselves to the mind on such occasions, when they do not in fact express the true principle upon which the action of the court is founded. The same formula may have an application, more or less suitable and exact, to a considerable variety of cases; and the all-embracing phrase, *res gestæ*, is very apt to come up when we are contemplating any of the facts and circumstances that accompanied the principal transaction which is the subject of investigation in any aspect of them.

The question before us is not whether the presiding judge placed the admission of the testimony upon exactly the true ground, but whether it is competent testimony upon the question of identity.

We are clearly of opinion that it is. The doctrine which we hold is this: The outcries of a person deceased during the perpetration of the assault which results in death, or upon the approach of the assailant, are competent evidence upon the trial of a

party charged with the murder of such person, and may be considered by the jury with other circumstances and testimony upon the question of the identity of the accused. The outcries of another person who was murdered by the same party a few minutes previously during the perpetration of one and the same burglary, but on another part of the premises, are admissible under like circum stances for the same purpose upon such trial.

Such outcries certainly partake much of the nature of *res gestæ*, more distinctly so than the statement in *Commonwealth* v. *McPike*, *ubi supra*, which accompanied the sending for a physician; but we think that the precise ground upon which their admission should be placed in a case like this, is substantially the same as that upon which dying declarations are declared admissible.

Speaking of dying declarations, Roscoe says (Crim. Ev. p. 30): "Evidence of this kind which is peculiar to the case of homicide has been considered by some to be admissible from necessity, since it often happens that there is no third person present to be an eye witness to the fact, and the usual witness in other felonies, viz., the party injured himself is got rid of; but it is said by Eyre, C. B., that the general principle upon which evidence of this kind is admitted is that it is of declarations made in extremity, when the party is at the point of death, . . . when every motive to falsehood is silenced, and the mind is induced by the most powerful considerations to speak the truth. A situation so solemn and so awful is considered by the law as creating an obligation equal to that which is imposed by an oath administered in court." Roscoe adds: "Probably it is the concurrence of both these reasons which led to the admission of this species of evidence."

Both these conditions exist in the case at bar. There is as truly a necessity to corroborate the testimony of a surviving witness, whose testimony to the identity of the murderer and the accused may be attacked on the ground that in the darkness and excitement she was liable to mistake, as there is to furnish evidence when no person who witnessed the assault remains alive. Moreover, it is the danger that no surviving witness can be found, which operates

to establish the rule, which is of general application, and the fact that in the particular case one did survive would not abrogate it.

And as to the second condition, no one can doubt that the exclamations of these two women embodied the truth as it appeared to each, and that the cries of alarm or supplication uttered by any and all human beings under similar circumstances, would express their perceptions of existing facts as truly as if backed by the sanction of all the oaths known in christendom. To reject the evidence afforded by the agonized entreaties of one standing face to face with death in the person of a murderer with uplifted weapon, when we would accept the account of the affair afterwards given by the enfeebled victim, with perceptions and recollections darkened and dimmed by the mists and shadows of approaching dissolution, would be, we think, but a bad sample of "the perfection of human reason." It is not to such exclamations that any of the substantial objections to hearsay testimony can be held to apply. Those outcries were as plainly circumstances proper for the consideration of the jury in the attempt to ascertain whether the prisoner was guilty of that crime, as any other portion of the circumstantial evidence in the case. Manifestly, the tendency of Karen's exclamation, John scared me, John killed me, was to exculpate the defendant and to direct suspicion towards John Hontvet, the head of the family. If it had been withheld by the government, and the defendant had offered to prove it, should we have felt justified in excluding a fact from which, if uncontrolled, such a pregnant inference could be drawn? Certainly, as in every case of proof drawn from circumstances, caution is required to avoid drawing rash or unfounded inferences, and the declarations are liable to be controlled by other proved facts, as Karen's were in the present instance; but the liability to mistake and error inherent in all descriptions of human testimony is not so great in this as to justify its exclusion.

We think that the reception of this testimony is justified both on principle and authority. It is the fact of a contemporaneous recognition or non-recognition of the accused by the deceased which

possesses any probative force, and any declarations made at the time, evincive of that fact, may fairly be said to come within the principle which regulates and permits the admission of declarations of third persons when they form a part of the *res gestæ*. It would justify their reception even if that were the sole ground upon which it could be placed. Nor do we think that anything in the learned and able discussion of that principle by Fletcher, J., in *Lund* v. *Tyngsborough*, 9 Cush. 36, can justly be said to militate against their admission. We do not wish to be understood as holding that the dread of immediate death is indispensable to the admission of contemporaneous exclamations of recognition like these, in cases of homicide.

We merely say that whatever force is given to dying declarations as the utterances of those who, on account of their peculiar situation, may be relied on to tell the exact truth as it appears to them, must needs be accorded also to the exclamations of mortal terror caused by a deadly assault.

VI. The objection to the admission of package marked B., which consisted of the contents of Wagner's pockets when he was searched by the officers in Boston the evening after the murder, is still insisted on, mainly upon the ground that the articles had not been identified except as having been found in Wagner's possession. It is not easy to see how they could have been in any respect prejudicial to the prisoner's case if they had not been substantially proved to have come from the house which was the scene of the murder and robbery. It is true that the articles were none of them such as were likely to be positively identified. But there was evidence that the day before the murder Karen had placed in her purse which contained a silver half-dollar and "a lot of coppers," a single small white porcelain button.

The following evening among the contents of the prisoner's pockets appeared a silver half-dollar, "a lot of coppers," and a single small white button, of the same description as that which Karen had placed in her purse the afternoon before, and unlike any which the prisoner had upon any of his clothes. Karen's purse was

found upon the floor of the house entirely empty. These circumstances were competent evidence,—taken by themselves by no means conclusive,—but in connection with others not insignificant.

We do not understand that positive identification is essential in such cases. Proof of the possession of similar property, with such circumstances as tend to establish the identity if unexplained, may furnish ground for a legitimate inference, the force and value of which the jury must determine in view of all the circumstances of the case.

It is impossible to imagine that the exhibition of the articles respecting which there was no evidence tending to show that they came from Hontvet's house could have injured the defendant. Moreover, there was no objection to any specific articles, but only to the package as a whole.

VII. We see no ground for the complaint of the admission of the pencil. A witness testified positively that it was the prisoner's pencil, and that he saw it in his possession at Portsmouth a few days before the murder. Another witness testified to finding it in the entry of Hontvet's house a day or two after the murder. If both statements were true, the facts were significant. An examination of the pencil itself was likely to be serviceable in enabling the jury to determine whether any witness could identify it with certainty.

None of the other exceptions to the rulings in relation to the admission or exclusion of testimony is relied on in argument, and a careful review of the case satisfies us that they are all devoid of merit.

It is competent for the prosecuting officer to explain his positions and illustrate the testimony by diagrams as well as by word of mouth. This was all the use that was made of the plans.

No witness who hears a conversation can be excluded from testifying in relation to it because it was not addressed to him and the party to whom it was addressed is a witness in the case.

Ample opportunity was allowed to contradict any government witness, or to show the *animus* of any such witness towards the

prisoner. The evidence offered and excluded was purely immaterial.

We find no good cause for a new trial, upon a careful consideration of the whole case, and accordingly the entry must be

*Exceptions overruled.*