RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0035p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

VICTOR EVERETTE SILVERS,

*Defendant-Appellant*.

┐
│
│
│
>  No. 23-5427
│
│
│
┘

Appeal from the United States District Court for the Western District of Kentucky at Paducah.
No. 5:18-cr-00050-1—Benjamin J. Beaton, District Judge.

Argued: December 10, 2024

Decided and Filed: February 20, 2025

Before: MOORE, CLAY, and THAPAR, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Sarah S. Gannett, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Phoenix, Arizona, for Appellant. Terry M. Cushing, UNITED STATES ATTORNEY'S OFFICE, Louisville, Kentucky, for Appellee. **ON BRIEF:** Sarah S. Gannett, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Phoenix, Arizona, for Appellant. Terry M. Cushing, UNITED STATES ATTORNEY'S OFFICE, Louisville, Kentucky, for Appellee.

MOORE, J., delivered the opinion of the court in which CLAY, J., concurred, and THAPAR, J., concurred in Part II(B) and concurred in the judgment in Parts II(A) and II(C). THAPAR, J. (pp. 28–39), delivered a separate concurring opinion.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.  Brittney Silvers, an active member of the United States Army, was shot and killed while living on Fort Campbell, an Army base on the border of Kentucky and Tennessee.  A jury found Brittney's estranged husband, Victor Silvers ("Silvers"), guilty of her premeditated murder.  Following his conviction, the district court sentenced Silvers to life in prison.

On appeal, Silvers challenges his conviction and sentence on three grounds.  First, he argues that the district court erred in taking judicial notice of the fact that Fort Campbell was within the United States' special maritime and territorial jurisdiction.  Second, he argues that the district court abused its discretion in denying Silvers's motion to exclude a juror who wore a shirt supporting military veterans during the trial and who had served in the United States Navy, and in failing to ask a broader question during voir dire about prospective jurors' prior military service.  Third, he challenges the constitutionality of his mandatory life sentence, arguing that it constitutes cruel and unusual punishment in violation of the Eighth Amendment.

Because the district court did not err in taking judicial notice of the fact of the United States' jurisdiction over Fort Campbell, nor did it abuse its discretion in denying Silvers relief based on Juror 5's alleged bias, we **AFFIRM** his conviction.  And because Silvers's life sentence is constitutional under binding Supreme Court precedent, we also **AFFIRM** his sentence.

## I.  FACTUAL BACKGROUND

### A.  The Murder of Brittney Silvers

On the evening of October 14, 2018, neighbors found Brittney Silvers outside her apartment at 4217 Contreras Court, Fort Campbell, Kentucky with multiple gunshot wounds.  R. 307 (PSR at ¶ 38) (Page ID #2168).  Despite neighbors' attempts to resuscitate her, Brittney Silvers was pronounced dead shortly after being transported by EMS to the Blanchfield Army

Community Hospital. *Id.* Brittney Silvers's boyfriend, James Keating, was also found at the scene with a gunshot wound to his leg. *Id.*

Special Agents of the Military Police responded to the scene. *Id.* at ¶ 39 (Page ID #2169). When they arrived, they saw a man sitting in a car parked in Brittney Silvers's driveway who was being held at gunpoint by Military Police officers. *Id.* Agents noted that the man was shaking and mumbling "where is my wife, is my wife okay?" and removed him from the car and arrested him. *Id.* The man in the car was Victor Everette Silvers ("Silvers"), Brittney Silvers's estranged husband. *Id.* at ¶ 39, 41 (Page ID #2169).

Victor and Brittney Silvers were married in December 2011. R. 342 (Trial Tr. II at 14) (Page ID #2539). Brittney Silvers was a logistics specialist with the United States Army and was stationed at Fort Campbell, an Army installation located on the border of Kentucky and Tennessee. *Id.* at 14–15 (Page ID #2539–40). Although the two initially lived together on the base, at some point, they separated and Silvers moved to Clarksville, Tennessee. R. 349 (Trial Tr. V at 93–95) (Page ID #3157–59). Both began dating other people, and Brittney Silvers began a relationship with Keating. *Id.* at 94–95 (Page ID #3158–59).

In September 2018, Brittney Silvers sought and obtained an emergency protection order after Silvers called both Brittney Silvers and her mother and threatened Brittney Silvers's life and that of Keating. R. 342 (Trial Tr. II at 16–17, 78) (Page ID #2541–42, 2603); R. 343 (Trial Tr. III at 50) (Page ID #2739). A judge converted that order into a domestic violence protection order on October 9, 2018 following a hearing that Silvers failed to attend. R. 342 (Trial Tr. II at 85–87) (Page ID #2610–12). The order restrained Silvers from having any physical contact with Brittney Silvers and forbade Silvers from possessing any firearms. *Id.* at 85–86 (Page ID #2610–11).

At trial, several eyewitnesses—including Keating—testified about the events of the night of October 14, 2018. All testified that Silvers was the person who had shot Brittney Silvers three times in the head and chest and who had shot Keating in the leg. *Id.* at 114 (Page ID #2639); R. 343 (Trial Tr. III at 54–55) (Page ID #2743–44). Although Silvers initially denied any

involvement with the shootings, he later admitted to shooting Brittney Silvers and intending to kill Keating.  R. 349 (Trial Tr. V at 105–06, 108) (Page ID #3169–70, 3172).

**B.  The Proceedings Below**

A grand jury indicted Silvers on November 13, 2018 on counts of first-degree murder, attempted first-degree murder, domestic violence, violation of a protection order, possession of a firearm by a prohibited person, and the carry, use, and discharge of a firearm during a crime of violence.  R. 14 (Indictment at 1–5) (Page ID #66–70).  The government filed a second superseding indictment on November 8, 2022, that adjusted one count of the carry, use, and discharge of a firearm during a crime of violence to the carry, use, and discharge of a firearm during a crime of violence resulting in death.  R. 239 (Second Super. Indictment at 1–5) (Page ID #1480–84).

**1.  Motion for Judicial Notice and Evidentiary Hearing**

Four of the seven counts of the superseding indictment—Counts One (first-degree murder), Two (attempted murder), Three (domestic violence), and Four (violation of a protection order)—included as an element of the charge that the crime took place within the special maritime and territorial jurisdiction of the United States.  18 U.S.C. §§ 1111(b); 1113; 2261(a)(1); 2262(a)(1).  In charging Silvers, the government alleged that the crime had occurred on Fort Campbell, a military base over which the federal government exercises jurisdiction.  *See generally* R. 239 (Second Super. Indictment).

Prior to Silvers's trial, the government moved the district court to take judicial notice of the fact that Brittney Silvers's apartment at 4217 Contreras Court, Fort Campbell, Kentucky, and the immediate vicinity, was within the special maritime and territorial jurisdiction of the United States.  R. 184 (Mot. for Jud. Not. at 1–11) (Page ID #999–1009).  Silvers opposed the motion, arguing that the question should instead be presented to the jury.  R. 209 (Opp. to Jud. Not. at 1–12) (Page ID #1119–30).

The district court held a hearing on the motion at which it reviewed the government's proffered evidence of the federal government's jurisdiction over Fort Campbell and heard

arguments from both parties as to whether the question was suited for resolution by the judge or a jury. *See generally* R. 292 (Jud. Not. Hr'g Tr.). The government presented three witnesses, all members of the Army Corps of Engineers: the Corps's chief of the Military Branch in the Real Estate Division in the Louisville District, who testified that the United States had exclusive jurisdiction over Fort Campbell, *id.* at 5 (Page ID #1837); a Corps surveyor, who identified the tract of land where Brittney Silvers lived as being within Fort Campbell, *id.* at 9–10 (Page ID #1841–42); and a Corps realty specialist, who, using historical documents, testified that the United States had accepted jurisdiction over the land that would become Fort Campbell, *id.* at 26, 30 (Page ID #1858, 1862). Specifically, the real-estate specialist showed (1) the 1942 final deed transferring the land to the United States; and (2) a series of letters between the Secretary of War and Kentucky's then-governors in which the Secretary of War accepted jurisdiction over the land that would become Fort Campbell. *Id.* at 23–26 (Page ID #1855–58); R. 355-5 (Deed at 1–4) (Page ID #3412–15), 355-6 (Apr. 28, 1945 Letter) (Page ID #3416), 355-7 (Aug. 3, 1945 Letter) (Page ID #3417), 355–11 (Mar. 29, 1943 Letter) (Page ID #3448), 355–12 (Jan. 3, 1944 Letter) (Page ID #3449). Silvers challenged the authenticity of all of the letters. R. 292 (Jud. Not. Hrg. Tr. at 26–27, 49–51) (Page ID #1858–59, 1881–83).

After considering the evidence and arguments from both parties on the motion, the district court summarily overruled Silvers's objection and granted the government's motion. *Id.* at 57 (Page ID #1889). At trial, the district court gave the following instruction to the jury as to the first-degree murder charge:

> The fourth element refers to the special maritime and territorial jurisdiction of the United States. 4217 Contreras Court is located within the special maritime and territorial jurisdiction of the United States. If you find beyond a reasonable doubt that the crime occurred at 4217 Contreras Court, that is sufficient to find that it occurred within the special maritime and territorial jurisdiction of the United States.

R. 350 (Trial Tr. VI at 27) (Page ID #3246). The district court further specified that this jurisdiction instruction applied to the attempted-murder charge, the domestic-violence charge, and the violation of a protection order charge. *Id.* at 30–32 (Page ID #3249–50). Following Silvers's trial, the district court issued a supplemental opinion and order setting forth its reasoning and reaffirming its decision to grant the government's motion to "take judicial notice

that 4217 Contreras Court at Fort Campbell, Kentucky, is within the special maritime and territorial jurisdiction of the United States." R. 316 (Juris. Order at 1–11) (Page ID #2240–50).

### 2. Voir Dire and Questioning of Juror 5

Following the district court's resolution of both parties' pretrial motions, Silvers's case proceeded to trial. Both parties submitted proposed voir dire questions for the district court's consideration. R. 160–1 (Def. Juror Q. at 1–10) (Page ID #675–86); 225 (Govt. Voir Dire at 1–4) (Page ID #1272–75). Each proposed questionnaire suggested some version of the same question: whether any prospective juror, or someone close to them, had served in the United States military. R. 160-1 (Def. Juror Q. #14 at 5) (Page ID #679) ("Have you, an immediate family member or anyone close to you ever served in the U.S. military? If so, please describe the branch of service, rank, place of service, dates of service, and the type of discharge received . . . ."); R. 225 (Govt. Voir Dire Q. #9 at 2) (Page ID #1273) ("Have you or anyone close to you been a member of the United States Military? What branch?"). During voir dire, the district court asked a slightly different version of the question:

> Does anyone here, or anyone in your immediate family, work with the United States Justice Department, the U.S. Army, the FBI, the ATF, or the Christian County Sheriff's Office?

R. 341 (Trial Tr. I at 111) (Page ID #2451). Neither party objected to the district court's question, and a jury was seated and sworn.

Silvers's trial began on November 29, 2022. On the first day of trial, the defense brought to the district court's attention that one of the jurors, Juror 5, was wearing a shirt made by Til Valhalla Project ("TVP"), a company that donates its proceeds to honor fallen soldiers. R. 342 (Trial Tr. II at 99–100) (Page ID #2624–25). Silvers asked the district court to question Juror 5 as to whether the shirt had any significance to him and whether the subject matter of the trial affected his choice to wear it. *Id.* at 100 (Page ID #2625). At the end of the day, the district court asked Juror 5 to stay back and engaged him in the following line of questioning:

> [THE COURT]: You're Juror Number 5; correct?
>
> A JUROR: Yes, sir.

THE COURT:  Someone in the court noticed the TVP shirt that you're wearing today, and I think that may—do you know what the Valhalla Project is?

A JUROR:  Yeah, it's just the clothing line that's ran by veterans.

THE COURT:  Okay.  And we've heard some testimony and discussion yesterday about military personnel and so forth.  Out of curiosity, is there any connection between your wearing that shirt today and anything going on in the case?

A JUROR:  No.  The only thing is I'm a veteran, that's all.

THE COURT:  Okay.  And when did you serve?  I think you told me yesterday, but I can't recall.

A JUROR:  No, the only questions you asked yesterday was Army.  I'm with the Navy.

THE COURT:  I see.  I see.  Okay.  And I apologize for misremembering.

*Id.* at 156 (Page ID #2681).  When asked why he had chosen to wear that specific shirt to trial, Juror 5 responded that he worked in fields such that most of his clothes were dirty and that his "clean stuff is usually this."  *Id.* at 157 (Page ID #2682).  The district court then asked Juror 5 whether his past military experience had any bearing on his ability to be a fair and impartial juror in the case:

> THE COURT:  If I had asked yesterday the question "Was anyone here—not just Army, but, you know, served in the military?"  And you would have said yes and I followed up and asked you, "Is there anything about your service or folks you know that would affect your ability to serve as a fair and impartial juror in a case that involves the military—the Army context instead of another branch," would you—how would you have responded?
>
> A JUROR:  I don't think it'll affect me whatsoever.

*Id.*  The district court then excused Juror 5, and neither party raised an objection to Juror 5's continued service on the jury.  *Id.* at 158 (Page ID #2683).

The next morning, however, Silvers moved to dismiss Juror 5 on the ground that he had been dishonest during voir dire by failing to disclose his time in the Navy.  R. 343 (Trial Tr. III at 9) (Page ID #2698).  Silvers's argument was that, even though the district court had asked potential jurors only about any connection to the Army, other potential jurors had volunteered their connections to other branches of the military, and Juror 5 should have done the same.  *Id.* at

9–10 (Page ID #2698–99). In response to this argument, the district court went through each of the responses that potential jurors had given involving other branches of the military. *Id.* at 10–12 (Page ID #2699–701). The district court then stated,

> I disagree [that I was speaking of the military]. I think I was clearly speaking about the Army. That led to some answers that were broader, but I believe all the answers that we received were connected in one way or another to the fact—the items I mentioned specifically—Fort Campbell, law enforcement, Army.

*Id.* at 12 (Page ID #2701). The district court thus concluded that Juror 5 had not made any "tacit misrepresentation" by failing to answer the voir dire question and found Juror 5's explanation for having worn the TVP shirt credible. *Id.* The district court then denied Silvers's motion to strike the juror. *Id.*

Silvers's trial continued. Then, on the sixth and final day of trial, the jury returned a verdict of guilty as to all seven counts. R. 282 (Verdict at 1–7) (Page ID #1736–42).

### 3. Sentencing

Before Silvers's sentencing, the Probation Office submitted a Presentence Investigation Report ("PSR") computing Silvers's total offense level as 43 and his criminal history category as II, with a resulting Guidelines range of life imprisonment. R. 307 (PSR at ¶ 76, 91, 121) (Page ID #2174, 2179, 2183). More important than the advisory Guidelines range in calculating that sentence, however, was the fact that Silvers's conviction for first-degree murder under 18 U.S.C. § 1111(b) carried a mandatory life sentence. *Id.* at ¶ 119 (Page ID #2183). Silvers's conviction for the carry, use, and discharge of a firearm during a crime of violence—the attempted murder of Keating—under 18 U.S.C. § 924(c)(1)(A)(iii) also carried a mandatory consecutive term of imprisonment of 120 months. *Id.* at ¶ 119–20; R. 239 (Second Super. Indictment at 5) (Page ID #1484).

At sentencing, Silvers argued that the mandatory life sentence accompanying his conviction under § 1111(b) was unconstitutional because it constituted cruel and unusual punishment in violation of the Eighth Amendment. R. 344 (Sent'g Tr. at 32–33) (Page ID #2823–24). The district court, recognizing that the life sentence was "extremely serious and severe," nevertheless concluded that it was "not unconstitutional in light of the precedent that the

lawyers have discussed, and it's not disproportionate to the extremely serious crimes at issue here."  *Id.* at 37 (Page ID #2828).  The district court then imposed a sentence of life imprisonment for Brittney Silvers's murder plus a consecutive term of ten years of imprisonment for the discharge of a firearm during the attempted murder of Keating.  *Id.* at 38 (Page ID #2829); R. 325 (Judgment of Sent. at 3) (Page ID #2297).  The district court specified that this sentence was to run concurrently with a twenty-year sentence, a ten-year sentence, and a second sentence of life imprisonment on the other counts of conviction.  R. 344 (Sent'g Tr. at 38) (Page ID #2829).  Silvers timely appealed.  R. 326 (Notice of Appeal at 1) (Page ID #2303).

## II.  DISCUSSION

### A.  Judicial Notice of Jurisdiction

The first issue that Silvers raises on appeal is whether the district court erroneously determined that Fort Campbell, the Kentucky Army base where Brittney Silvers was killed, was within the special maritime and territorial jurisdiction of the United States and improperly instructed the jury to take judicial notice of that fact instead of submitting that question to the jury.  Before analyzing this question of first impression in our Circuit, we pause to clarify what it means for a particular location to be within the federal government's special maritime and territorial jurisdiction.

#### 1.  Defining Special Maritime and Territorial Jurisdiction

Four of the seven counts of Silvers's conviction—his convictions under 18 U.S.C. § 1111(b) (murder), § 1113 (attempted murder), § 2261(a)(1) (domestic violence), and § 2262(a)(1) (violation of a protection order)—include as a necessary element that the crime took place "within the special maritime and territorial jurisdiction of the United States."  So, to obtain a conviction under 18 U.S.C. §§ 1111(b), 1113, 2261(a)(1), or 2262(a)(1), the government must prove that the crime took place within the federal government's "special maritime and territorial jurisdiction."  In relevant part, federal law defines "special maritime and territorial jurisdiction of the United States" as

> [a]ny lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise

acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building.

*Id.* § 7(3).

As the district court observed, "[c]ounterintuitively, perhaps, the acquisition of land or exercise of control by the U.S. government does not create even a presumption that federal jurisdiction applies there."  R. 316 (Juris. Order at 2) (Page ID #2241) (citing *United States v. Williams*, 17 M.J. 207, 211 (C.M.A. 1984) ("Although some may assume that a military installation automatically comes within Federal jurisdiction, that assumption is incorrect.")). Instead, pursuant to statute, to show that a particular location is within the special maritime and territorial jurisdiction of the United States, the government must prove that (1) the state in which the at-issue land is located has consented to transfer the land to the jurisdiction of the United States and (2) that the federal government has accepted that transfer of jurisdiction.  40 U.S.C. § 3112(b); *see Paul v. United States*, 371 U.S. 245, 264 (1963) ("Since 1940 Congress has required the United States to assent to the transfer of jurisdiction over the property, however it may be acquired.")

In Silvers's case, the district court determined, based upon evidence that the government presented at an in-depth pretrial evidentiary hearing, that Kentucky had agreed to transfer Fort Campbell to the federal government and that the federal government had acquiesced to that transfer.[1]  R. 316 (Juris. Order. at 8) (Page ID #2247).  At trial, the district court told the jury that 4217 Contreras Court is within the United States' special maritime and territorial jurisdiction, thus directing the jury to find that the jurisdictional element of the charged crimes had been satisfied if the jury found beyond a reasonable doubt that the crime occurred at 4217 Contreras Court.  R. 350 (Trial Tr. VI at 27) (Page ID #3246).

On appeal, Silvers argues that the district court erred in making this determination because whether the federal government accepted the transfer of jurisdiction was a question of

---

[1]Both below and on appeal, Silvers concedes that the government has proven that Kentucky consented to the transfer of jurisdiction over Fort Campbell to the United States.  Appellant Br. at 28; R. 209 (Opp. to Jud. Not. at 3 n.2) (Page ID #1121).  He contests only the government's accession.

fact that should be submitted to the jury, not a question of law for the court to decide. We turn to that question next.

## 2. Standard of Review

Silvers's challenge to his conviction is a constitutional one: whether, under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *United States v. Gaudin*, 515 U.S. 506 (1995), the Fifth and Sixth Amendments require that a jury, not a judge, determine beyond a reasonable doubt that a location is within the special maritime and territorial jurisdiction of the United States. We review constitutional questions de novo. *United States v. Blackwell*, 459 F.3d 739, 752 (6th Cir. 2006). We therefore review afresh whether the district court properly instructed the jury to take judicial notice of the jurisdictional status of Fort Campbell instead of submitting the question to the jury.

## 3. Permissibility of Taking Judicial Notice of Special Maritime or Territorial Jurisdiction

We first consider the constitutional backdrop underlying Silvers's claim. In *Gaudin*, the Supreme Court held that the Due Process Clause of the Fifth Amendment and the Sixth Amendment right to a jury trial "require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." 515 U.S. at 510. As a result, the Court held that, where materiality—a mixed question of law and fact—was an element of the charged offense, the defendant had "the right to have a jury determine . . . his guilt of every element of the crime with which he is charged," including the materiality of his allegedly false statements. *Id.* at 512, 522–23. Subsequently, in *Apprendi*, the Supreme Court cited *Gaudin* for the proposition that, "[t]aken together, [the Sixth and Fourteenth Amendments] indisputably entitle a criminal defendant" to a jury determination of guilt as to each element of the offense charged. 530 U.S. at 477. The Court thus determined that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490.

Silvers argues that *Gaudin* and *Apprendi* require us to hold that, because federal jurisdiction is a necessary element of several of the offenses with which Silvers was charged, the question of whether a particular location—in this case, Fort Campbell—is within the United States' territorial jurisdiction must be proven to the jury beyond a reasonable doubt. Appellant Br. at 25, 29–34. The government disagrees, arguing that neither case addressed the issue of special maritime and territorial jurisdiction and thus they "do not apply to the question now before this [c]ourt." Appellee Br. at 25.

We disagree with the notion that *Gaudin* and *Apprendi* are inapplicable to the case at bar simply because the cases did not address the very same subject. Both cases, and their progeny in our circuit, stand for the important proposition that each essential element of a crime with which a criminal defendant is charged must be proven to a jury beyond a reasonable doubt. And the jurisdictional element of a number of federal crimes—four crimes charged here—is one such essential element.

Critically, however, the jurisdictional element of crimes such as § 1111 includes two separate inquiries: first, whether the parcel of land falls within the United States' special maritime and territorial jurisdiction; and second, whether the alleged offense occurred within that area. *See United States v. Gabrion*, 517 F.3d 839, 871 (6th Cir. 2008) (Moore, J., concurring). Silvers is correct that the second inquiry is a question of fact that, under *Gaudin* and *Apprendi*, must be submitted to the jury and proven beyond a reasonable doubt. But the first inquiry—the pure question of a location's jurisdictional character—is a legal question, one which turns on legislative, not adjudicative, fact.

We first distinguished between adjudicative and legislative facts in *Dayco Corp. v. Federal Trade Commission*, 362 F.2d 180 (6th Cir. 1966). There, we stated that "'legislative facts' involve generalized factual propositions which could form the basis for a legislative ruling which would have application to some class of situations, while 'adjudicative facts' relate to, and are determinative of, one individual situation or course of conduct." *Id.* at 186. Several years later, in *Toth v. Grand Trunk Railroad*, we defined "adjudicative facts" as "the facts of the particular case" and "legislative facts" as "facts 'which have relevance to legal reasoning . . . , whether in the formulation of a legal principle or ruling by a judge . . . or in the enactment of a

legislative body.'"  306 F.3d 335, 349 (6th Cir. 2002) (quoting Fed. R. Evid. 201, advisory committee's note (1972)); *see also Ohio v. Collins (In re Madeline Marie Nursing Homes)*, 694 F.2d 433, 445 n.13 (6th Cir. 1982) (similarly quoting the advisory committee note to Federal Rule of Evidence 201 for the proposition that there are "fundamental differences between adjudicative facts and legislative facts" in that adjudicative facts, but not legislative facts, relate to a particular case).  Most recently, in *United States v. Miller*, we defined the terms again, referring to "legislative fact[s]" as those "[]to be decided uniformly[]" and "adjudicative fact[s]" as those "[]to be decided anew by hundreds of district judges[.]"  982 F.3d 412, 430 (6th Cir. 2020).  The general principle that adjudicative facts relate to the particular facts of a specific case while legislative facts relate to universally established facts that do not change from case to case thus appears to be well settled in this court.

Whether something is an adjudicative or legislative fact has crucial implications; namely, under Federal Rule of Evidence 201—the rule that governs judicial notice—a district court must instruct a jury that it may disregard a judicially noticed *adjudicative* fact, but need not do the same for a judicially noticed *legislative* fact.  Fed. R. Evid. 201(a) ("This rule governs judicial notice of an adjudicative fact only, not a legislative fact."); *id.* at (f) ("In a criminal case, the court must instruct the jury that it may or may not accept the noticed [adjudicative] fact as conclusive.").  The rule thus highlights the difference between these two categories of facts:  one (adjudicative facts) concerns facts that must be proven to a jury beyond a reasonable doubt, and the other (legislative facts) concerns facts which a court may conclude exist as a matter of law.

The pertinent question before us, then, is whether the existence of special maritime or territorial jurisdiction of the United States is an adjudicative fact or a legislative fact.  We conclude that it is the latter.

In reaching this conclusion, we look first to the caselaw in this court, of which there is little.  First, in *United States v. Harris*, a case in which the government had presented no evidence that Hamilton County, Ohio was within the Southern District of Ohio, we held that a "[d]istrict [c]ourt may take judicial notice of established geographical facts" without need for those facts to be proven to a jury beyond a reasonable doubt.  331 F.2d 600, 601 (6th Cir. 1964) (per curiam).  Two subsequent opinions hinted that the same was true in the specific context of

the fact of special maritime and territorial jurisdiction. *United States v. Blunt*, 558 F.2d 1245, 1247 (6th Cir. 1977) (per curiam) (stating, in dicta, that a "district court would have been correct in taking judicial notice under Rule 201, Federal Rules of Evidence, of the fact that the [Federal Correctional Institution in Lexington] was within the territorial jurisdiction of the United States"); *United States v. Booth*, No. 905748, 1991 WL 119530, at *5–6 (6th Cir. July 3, 1991) (table) (holding that "[w]hether a United States [Army base] is within the special maritime and territorial jurisdiction of the United States is a legal issue, not a factual issue").**2**

Most recently, in *United States v. Gabrion*, we addressed a related issue: whether a district court erred in concluding, following an evidentiary hearing, that the United States had concurrent jurisdiction over a portion of the Manistee National Forest where the body of Gabrion's victim had been found. 517 F.3d at 845. We concluded that, as a matter of law, the federal government may exercise concurrent legislative jurisdiction over national forests. *Id.* at 848 (Batchelder, J.); 857 (Moore, J., concurring).**3** And in an opinion concurring in the judgment, we addressed the specific jurisdictional question raised here, stating that "in evaluating the [issue of special maritime or territorial jurisdiction] we must review both legal conclusions of the district court and factual conclusions of the jury." *Id.* at 870 (Moore, J., concurring). Although stating that "[w]hether the government proved that Gabrion murdered Timmerman on a parcel of national forest land over which the federal government has criminal jurisdiction is an element of the offense, which the government must prove to the jury beyond a reasonable doubt," the concurrence also noted that the jurisdictional element contains two separate inquiries: whether the parcel of land falls within the United States' special maritime and territorial jurisdiction, and whether the alleged offense happened within that parcel. *Id.* at 871 (citing *United States v. Prentiss*, 206 F.3d 960, 967 (10th Cir. 2000), *vacated on other grounds by United States v. Prentiss*, 256 F.3d 971, 981 (10th Cir. 2001) (en banc) ("While the court may determine, as a matter of law, the existence of federal jurisdiction over a geographic

---

**2***Booth*, although directly on point, is an unpublished opinion over thirty years old. It was also decided years before either *Gaudin* or *Apprendi*. So although persuasive to some degree, *Booth* does not decide this case.

**3**A majority of the panel also agreed that, for reasons that do not apply here, the location where Gabrion allegedly murdered the victim was within the special territorial and maritime jurisdiction of the United States. *Gabrion*, 517 F.3d at 856–57 (Batchelder, J.); 864 (Moore, J., concurring ).

area, whether the locus of the offense is within that area is an essential element that must be resolved by the trier of fact.")). Our decision in *Gabrion*—which, notably, was decided after both *Gaudin* and *Apprendi*—thus seems to follow our prior intimation that we should treat the jurisdictional issue as a legal one.

The available out-of-circuit authority bolsters this conclusion. Two circuits have thus far directly decided this question in precedential opinions. First, in *United States v. Davis*, a case concerning the very same jurisdictional issue raised here, the Second Circuit held that

> to determine whether a crime took place within the special maritime and territorial jurisdiction of the United States requires two separate inquiries: one to determine the "locus of the crime" and one to determine the existence *vel non* of federal jurisdiction. *See* [*United States v. Hernandez-Fundora*, 58 F.3d 802, 810 (2d Cir. 1995)]. While the former is plainly a factual question for the jury to decide, the latter—turning on a fixed legal status that does not change from case to case and involving consideration of source materials (such as deeds, statutes, and treaties) that judges are better suited to evaluate than juries—has always been treated in this Circuit as a legal question that a court may decide on its own.

726 F.3d 357, 368 (2d Cir. 2013). Critically, the Second Circuit noted that "[n]othing in *Apprendi* or its progeny called this distinction into question, let alone suggested that questions of law must be submitted to the jury under the Sixth Amendment." *Id.* Accordingly, the Second Circuit held that "we may take judicial notice on appeal of whether a particular piece of land falls within the special maritime and territorial jurisdiction of the United States." *Id.*

Second, and most recently, in *United States v. Love*, the Eighth Circuit held that "[a] district court may take judicial notice that a place is within the special maritime and territorial jurisdiction of the United States and not submit that issue to the jury, without violating a defendant's Sixth Amendment rights." 20 F.4th 407, 412 (8th Cir. 2021). In so holding, the Eighth Circuit determined that, based on that court's caselaw, "federal jurisdiction over a particular place is a question of law." *Id.* at 411. Next, the Eighth Circuit determined that "facts that resolve the special maritime and territorial jurisdiction question are legislative, not adjudicative" because "whether a particular facility is within federal jurisdiction is a universal

truth." *Id.* at 411–12. Finally, the Eighth Circuit stated that "judicially noticed legislative facts need not be submitted to the jury." *Id.* at 412.[4]

Silvers argues that these cases are unpersuasive because they "simply fail to account for *Gaudin*." Appellant Br. at 30. As an initial matter, the Second Circuit's decision in *Davis* did address *Apprendi*, holding that the defendant had "cite[d] no authority for the proposition that *Apprendi* and its progeny cast into doubt decisions about whether, and when, a court may take judicial notice of a legislative fact, and . . . we have found no such authority ourselves." *Davis*, 726 F.3d at 367–68. More importantly, in each case, the court determined that the jurisdictional question was a legal one, thus removing the issue from the purview of *Gaudin* and *Apprendi*.

In the alternative, Silvers argues that we should look instead to the Ninth Circuit's decision in *United States v. Read*, 918 F.3d 712 (9th Cir. 2019), a case that, if read liberally, stands for the opposite conclusion than that reached by the Second and Eighth Circuits. In *Read*, the Ninth Circuit reviewed a defendant's challenge to the sufficiency of the evidence used to convict him under 18 U.S.C. § 113(a), "which prohibits an assault 'within the special maritime and territorial jurisdiction of the United States.'" *Id.* at 717 (quoting 18 U.S.C. § 113(a)). In reviewing Read's claim that the government had presented insufficient evidence that the assault took place within the federal government's jurisdiction, the Ninth Circuit held that "[t]he existence of federal jurisdiction over the place in which the offense occurred is an element of the offenses defined at 18 U.S.C. § 113(a), which must be proved to the jury beyond a reasonable doubt." *Id.* at 718 (citing *Gaudin*, 515 U.S. at 510). But the Ninth Circuit then held that,

---

[4]Two other circuits have addressed this question in non-precedential opinions issued after *Gaudin* and *Apprendi*. In *United States v. Arroyo*, the Seventh Circuit held that, where a district court had taken "judicial notice, and instructed the jury to accept as fact, that Evansville is located in the Southern District of Indiana," the district court "did not invade the jury's province to decide . . . whether [Arroyo's] possession actually occurred in Evansville and thus within the district" because "the geographic boundaries of the judicial district encompassing Evansville . . . [is] not [an] element[] of [the statute] or adjudicative fact[]"; but "legislative fact[] for the court to decide." 310 F. App'x 928, 929–30 (7th Cir. 2009).

Additionally, in *United States v. Styles*, the Fifth Circuit held the same as the Second and Eighth Circuits, writing that because "[a] district court may take judicial notice of the legislative fact that a federal installation is under federal jurisdiction[,] . . . [t]he district court did not err by taking notice that the VA Hospital in Styles's case was within the special territorial jurisdiction of the United States." 75 F. App'x 934, 935 (5th Cir. 2003) (per curiam). Importantly, however, pursuant to Fifth Circuit rules, *Styles* holds no precedential value. *Id.* at 935 n.\*. Moreover, *Styles* appears to be in conflict with the Fifth Circuit's earlier, published opinion in *United States v. Perrien*, 274 F.3d 936 (5th Cir. 2001), discussed *infra*.

because "uncontradicted testimony from inmates or employees at a federal prison can establish" the required jurisdictional element, the government had, by eliciting testimony that the defendant was an inmate at the Phoenix federal prison at the time of the assault, adequately demonstrated that the federal prison "was under federal jurisdiction at the time Read allegedly committed the assault." *Id.*[5]

Unlike the Second and Eighth Circuits, the Ninth Circuit in *Read* made no distinction between the two inquiries included in the jurisdictional element:  the existence of jurisdiction and the locus of the alleged crime.  And unlike the case at bar, in *Read*, the government's jurisdictional evidence—which was in the form of testimony from the defendant and a correctional officer that Read "was an inmate of the Phoenix federal prison at the time of the assault"—was uncontested.  *Id.* (internal quotation marks omitted).  So the *Read* court did not, at least not clearly, decide the issue of whether a judge may determine the existence of special maritime or territorial jurisdiction and take judicial notice of that fact where the government's evidence of jurisdiction is contested.

Silvers also directs us to the D.C. Circuit's decision in *United States v. Khatallah*, 41 F.4th 608 (D.C. Cir. 2022) (per curiam), in support of his argument.  There, the D.C. Circuit addressed the question of whether, on plain-error review, a defendant was entitled to a new trial because the district court did not instruct the jury about a jurisdictional element of the statute under which the defendant was charged.  41 F.4th at 627.  The defendant was convicted under 18 U.S.C. § 1363, "which criminalizes the malicious destruction of buildings and property 'within the special maritime and territorial jurisdiction of the United States.'"  *Id.* at 624 (quoting 18 U.S.C. § 1363).  In bringing the charge, however, "the government relied only on the diplomatic premises definition of the special jurisdiction," which "applies to 'offenses committed by or against a national of the United States' on the premises of U.S. diplomatic facilities abroad."  *Id.* (quoting 18 U.S.C. § 7(9)).  But when both parties jointly proposed the jury instructions, neither party—nor the district court—recognized that the instructions omitted any

---

[5]The Ninth Circuit also held that "the jury was properly instructed that the government had to prove the assaults took place in FCI-Phoenix," suggesting that the key issue for the jury to resolve was the physical location where the assaults took place. *See Read*, 918 F.3d at 719.

mention of the requirement that the offense be committed "by or against a national of the United States." *Id.* at 627–28. So, when the district court, instructing the jury as to the statute's special jurisdictional element, "omit[ted] the preface that the crime in question must be committed 'by or against a national of the United States,'" the D.C. Circuit concluded that the district court had left out an essential element of the charge that the government was required to prove, and that the jury had to find, beyond a reasonable doubt. *Id.* at 628 (quoting 18 U.S.C. § 7(9)). The D.C. Circuit thus held that the district court's instructions were erroneous. *Id.*[6]

Although it addresses a similar issue to that raised in this case, *Khatallah* is distinguishable. Unlike this case, *Khatallah* involved the erroneous omission from the jury instructions of a statutory element of a charged crime. No party noticed that a required element of the charged crime was omitted from the jury instructions, nor was the error corrected at any point before the jury announced its verdict finding Khatallah guilty of Count 16. The question in *Khatallah* was therefore whether it was plain error for a district court to "omit[] a factual element that the jury had to find in order to convict Khatallah of violating" the statute, *id.* at 628—that is, whether the district court erred by failing to inform the jury that it must find that the government had proved that the offense was "committed by or against a national of the United States" in order to find Khatallah guilty. *See* 18 U.S.C. § 7(9). The D.C. Circuit answered that question in the affirmative. *Khatallah*, 41 F.4th at 628.

Here, the district court did not omit any factual element from the jury instructions. Put otherwise, the jury in this case was made aware that the statute under which Silvers had been charged required that the murder must have been committed at a location within the special maritime and territorial jurisdiction of the United States. Having already determined in a pretrial ruling that Fort Campbell was within the special maritime and territorial jurisdiction of the United States, however, the district court instructed the jury that "4217 Contreras Court is located within the special maritime and territorial jurisdiction of the United States" and that, if

---

[6]Despite concluding that the omission was in error and "assum[ing] for the purpose of [the] appeal that the error was plain," the D.C. Circuit nevertheless concluded that Khatallah failed to demonstrate that the error had affected his substantial rights because he failed to demonstrate "a 'reasonable probability' that the jury would have acquitted him of Count 16 if properly instructed." *Khatallah*, 41 F.4th at 628–30. The D.C. Circuit therefore found that Khatallah could not meet all four prongs of plain-error review and declined to vacate his conviction. *Id.* at 630.

the jury found beyond a reasonable doubt that Brittney Silvers's murder had occurred there, "that is sufficient to find that it occurred within the special maritime and territorial jurisdiction of the United States." R. 350 (Trial Tr. VI at 27) (Page ID #3246). Unlike the district court in *Khatallah*, then, the district court in this case did not neglect to inform the jury of any required factual element of the charged crime; instead, the district court, having concluding on its own that 4217 Contreras Court was within the special territorial and maritime jurisdiction of the United States, informed the jury of the element and instructed that the jury should find the element to have been satisfied if they found that the crime in fact occurred at 4217 Contreras Court. Had the district court, like the district court in *Khatallah*, neglected to inform the jury that the statute required the murder to have been committed within the special maritime and territorial jurisdiction of the United States, we would have concluded, like the *Khatallah* court, that such omission was in error. But because the facts of this case differ in this material way from those present in *Khatallah*, the cases are distinguishable.

Finally, Silvers points us to the Fifth Circuit's decision in *United States v. Perrien*, 274 F.3d 936 (5th Cir. 2001). In that case, decided shortly after *Apprendi*, the Fifth Circuit noted in a footnote that the holdings of *Gaudin* and *Apprendi* called into question that circuit's prior caselaw holding that "the preponderance of the evidence standard applies to the jurisdictional elements" of certain statutes. *Id.* at 939 n.1. Concluding that "the requirement that [an] assault be committed 'within the special maritime and territorial jurisdiction of the United States' is unambiguously included in the offense-defining part of the statute," the Fifth Circuit "question[ed]" its precedent, stating that it "doubt[ed] that a mere preponderance of the evidence on this element could suffice to support a guilty verdict." *Id.*

As of now, however, the Fifth Circuit has yet to take up *Perrien*'s invitation to overrule the circuit's precedent. And aside from one unpublished, and therefore nonprecedential, case, no panel of the Fifth Circuit has even discussed the *Perrien* footnote. *See United States v. Bailey*, 169 F. App'x 815, 821 (5th Cir. 2006) ("We share the *Perrien* court's concerns and likewise note the Supreme Court's discussions of the right to proof beyond a reasonable doubt afforded by the Due Process Clause and the Sixth Amendment."). So, while Fifth Circuit authority tilts in the

direction of the outcome that Silvers urges, it does so with insufficient weight to persuade us to depart from the Second and Eighth Circuits.

The available authority in our circuit, as well as the modest weight of the on-point authority in other circuits, leads us to the ultimate conclusion that the question of the existence of special maritime or territorial jurisdiction is a legal question, turning on the immutable, universal fact of the jurisdictional character of a particular location. As a result, we conclude that a district court may determine the legal question of the existence *vel non* of federal jurisdiction and direct a jury to take judicial notice of the existence of that jurisdiction without violating the constitutional command set forth by *Gaudin* and *Apprendi*. We do not reach this conclusion lightly; Silvers's argument, which urges us to consider carefully the constitutional implications of the removal of the jurisdictional question from the purview of the jury, is a fair and reasonable one. But our determination that the question of special maritime or territorial jurisdiction is a legal question vitiates Silvers's constitutional concern. We therefore affirm the district court's decision to take judicial notice that Brittney Silvers's apartment on Fort Campbell was within the United States's territorial jurisdiction.

## B. Juror Bias

The next issue Silvers raises on appeal is whether the district court erred in denying Silvers's motion to dismiss Juror 5 when it was revealed, during trial, that Juror 5 had served in the Navy and by failing to ask potential jurors about prior military service during voir dire.

"[T]he right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). "When a juror's impartiality is at issue, the relevant question is 'did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed.'" *United States v. Lanham*, 617 F.3d 873, 882 (6th Cir. 2010) (quoting *Dennis v. Mitchell*, 354 F.3d 511, 520 (6th Cir. 2003)).

Here, neither party disputes that Juror 5, when questioned, assured the court that he could "serve as a fair and impartial juror in a case that involves the military" despite having served in the Navy for five years. R. 342 (Trial Tr. II at 157) (Page ID #2682). But Silvers argues that the

district court erred in accepting Juror 5's assurance of impartiality and should have instead dismissed Juror 5 for bias against Silvers.  Appellant Br. at 53.  Silvers also argues that the district court erred in asking potential jurors during voir dire only whether they had served in the United States Army as opposed to asking a broader question about prior military service.  *Id.* For the reasons set forth below, we conclude that the district court committed no reversible error on either count.

### 1.  Standard of Review

We review a district court's decision to deny a motion for relief—in this case, a motion to dismiss a juror—because a juror failed fully to disclose information during voir dire for an abuse of discretion.  *See Jones v. Kent County*, 115 F.4th 504, 517 (6th Cir. 2024).  We apply the same abuse-of-discretion standard in reviewing a district court's voir dire of the jury venire.  *United States v. Guzman*, 450 F.3d 627, 629 (6th Cir. 2006).  "An abuse of discretion occurs when we are left with the definite and firm conviction that the [district] court . . . committed a clear error of judgment in the conclusion it reached . . . or where it improperly applies the law or uses an erroneous legal standard."  *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 504 (6th Cir. 2015) (quoting *United States v. Haywood*, 280 F.3d 715, 720 (6th Cir. 2002)).  "Only in the case of manifest error will we overturn a finding of juror impartiality."  *Guzman*, 450 F.3d at 629.

The government argues that Silvers failed to raise a challenge to the district court's question during voir dire, and that we should therefore consider the issue forfeited instead of reviewing the district court's decision for an abuse of discretion.  Appellee Br. at 37.  "When a party neglects to advance a particular issue in the lower court, we consider that issue forfeited on appeal."  *Greer v. United States*, 938 F.3d 766, 770 (6th Cir. 2019).  We review forfeited claims under the plain-error standard of review.  *United States v. Burrell*, 114 F.4th 537, 549 (6th Cir. 2024).  We are inclined to agree with the government—during voir dire, no objection was lodged to the at-issue question by either party, nor did Silvers object when the district court concluded questioning on the Army service issue. R. 341 (Trial Tr. I at 111, 116) (Page ID #2451, 2456–58) (asking if "[a]nyone else" had Army connections to report).  However, we need not decide the issue, because even under the more lenient abuse-of-discretion standard, Silvers's challenge fails.

**2.  The District Court's Impartiality Ruling**

Although neither party explicitly frames it as such, the issue presented here is one of alleged juror nondisclosure.  The legal framework under which we evaluate claims of juror nondisclosure comes from *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984).  "Under *McDonough*, for a prospective juror's nondisclosure to warrant a new trial, a defendant must show that (1) the juror 'failed to answer honestly a material question on *voir dire*,' and (2) 'a correct response would have provided a valid basis for a challenge for cause.'" *English v. Berghuis*, 900 F.3d 804, 813 (6th Cir. 2018) (quoting *McDonough*, 464 U.S. at 556).  Put differently, "the nondisclosure must have denied the defendant his Sixth Amendment right to an impartial jury." *Id*.

Silvers argues that the district court abused its discretion in finding that Juror 5 honestly answered the district court's question about military service during voir dire.  Appellant Br. at 56, 61.  In support of this argument, Silvers claims that, even though the district court's question during voir dire was whether any potential juror, or anyone in their immediate family, had "work[ed] with . . . the U.S. Army," R. 341 (Trial Tr. I at 111) (Page ID #2451), the court "had actually broadened the inquiry" by asking follow-up questions of other jurors that mentioned military service.  Appellant Br. at 56.  Specifically, the district court asked one juror who had served in the Army and worked for the Bureau of Prisons whether they had "had any other law enforcement or military-related job" since leaving the Bureau in 1990.  R. 341 (Trial Tr. I at 112) (Page ID #2452).  Another juror volunteered to the court that her husband was a retired marine, *id.* at 51 (Page ID #2391), and another juror volunteered to the court that he was a defense contractor supplying food service personnel at Fort Campbell and Fort Bragg, *id.* at 113 (Page ID #2453).

Silvers's argument that the district court implicitly "broadened the inquiry" into potential jurors' military service is unavailing.  The district court, when confronting this argument below, went through each question and answer that defense counsel had proffered as having broadened the inquiry into military service writ large.  R. 343 (Trial Tr. III at 10–12) (Page ID #2699–701).  The district court then stated,

> I disagree [that I was speaking of the military]. I think I was clearly speaking about the Army. That led to some answers that were broader, but I believe all the answers that we received were connected in one way or another to the fact—the items I mentioned specifically—Fort Campbell, law enforcement, Army.

*Id.* at 12 (Page ID #2701). That the district court would ask only about service in the Army, and that potential jurors would understand the district court's question as asking only about service in the Army, relates to the circumstance that the case involved a member of the Army who was killed while serving and living on an Army base.

In any event, we review for an abuse of discretion the district court's determination that Juror 5 had not "made any tacit misrepresentation by not speaking up in response to the question about the Army." *Id.*; *see Kent County*, 115 F.4th at 517. In finding that Juror 5—who had never worked for the Army, and therefore did not answer in the affirmative when asked if he had worked for the Army—answered the court's questions honestly, we are not convinced that the district court "committed a clear error of judgment in the conclusion it reached." *Rikos*, 799 F.3d at 504. The district court's determination that Juror 5 had answered its question honestly was within the court's discretion. And because we find no error in the district court's decision as to this first prong of the *McDonough* test, we need not proceed to the second. We therefore affirm the district court's denial of Silvers's motion to dismiss Juror 5 for bias.

### 3. The Voir Dire Question

Having found no error in the district court's bias determination, we next address Silvers's challenge to the district court's questioning during voir dire. Pursuant to Rule 24 of the Federal Rules of Criminal Procedure, the district court "may examine prospective jurors or may permit the attorneys for the parties to do so." Fed. R. Crim. P. 24(a)(1). If a trial judge decides to examine prospective jurors himself—which the district court elected to do here—the judge "must at the very least solicit questions from both parties' attorneys," but "is by no means *required* to ask these question[s] unless he deems them 'proper' or otherwise helpful to the voir dire process." *United States v. Sheldon*, 223 F. App'x 478, 481 (6th Cir. 2007) (citing *Rosales-Lopez v. United States*, 451 U.S. 182, 189 (1981) (plurality op.) (emphasis in original)).

"Because the obligation to empanel an impartial jury lies in the first instance with the trial judge, and because he must rely largely on his immediate perceptions, federal judges have been accorded ample discretion in determining how best to conduct the *voir dire*." *Rosales-Lopez*, 451 U.S. at 189. "In reviewing the district court's voir dire in this case," then, "we must determine whether the court 'abused the broad discretion vested in [it] . . . in [its] impaneling of [the] jury,' . . . remaining mindful of the fact that a district court 'retains great latitude in deciding what questions should be asked on voir dire.'" *United States v. Middleton*, 246 F.3d 825, 834 (6th Cir. 2001) (first quoting *United States v. Phibbs*, 999 F.2d 1053, 1071 (6th Cir. 1993); and then quoting *Mu'Min v. Virginia*, 500 U.S. 415, 424 (1991)).

Silvers argues that the district court abused this broad discretion by failing to "conduct[] an inquiry about panel members' potential bias for military victims and witnesses." Appellant Br. at 63. As a threshold matter, although Federal Rule of Criminal Procedure 24(a)(2) provides that a district court that elects to conduct voir dire must permit attorneys for both parties to ask or submit further questions of the venire, neither counsel for the defense nor counsel for the government asked or submitted any additional questions about any potential juror's prior military service after the district court conducted voir dire. And although defense counsel—or even the government—would likely have asked a different, broader question than asked by the district court, "[a] proffered *voir dire* question is not constitutionally required simply because it 'might be helpful in assessing whether a juror is impartial'; instead a question is constitutionally compelled only where the 'failure to ask [that] question [] . . . render[s] the defendant's trial fundamentally unfair.'" *Beuke v. Houk*, 537 F.3d 618, 637 (6th Cir. 2008) (quoting *Mu'Min*, 500 U.S. at 425–26). Here, the district court asked a detailed, specific question—"Does anyone here, or anyone in your immediate family, work with the United States Justice Department, the U.S. Army, the FBI, the ATF, or the Christian County Sheriff's Office?", R. 341 (Trial Tr. I at 111) (Page ID #2451)—intended to evaluate whether any member of the venire had an impermissible bias in favor of the United States Army. The question was closely tailored to the facts of Silvers's case, which involved the murder of an active-duty member of the Army at an Army base. So, while Silvers's preferred question "might have helped to expose juror bias[es]" in favor of the military at large, "its omission [did] not result in a fundamentally unfair trial, and therefore it [was] not constitutionally compelled." *Beuke*, 537 F.3d at 637.

Silvers contends that our holding in *United States v. Laird*, 239 F. App'x 971 (6th Cir. 2007), counsels the opposite conclusion. *Laird* is an unpublished case in which we held that a district court abused its discretion in failing, in a drug trafficking case, to question prospective jurors about their attitudes towards narcotics-related crimes. *Id.* at 975. In *Laird*, we concluded that the district court's voir dire question—"[A]nybody have anything in their background or anything of that nature that would not allow them to sit on this kind of case? Anybody has been charged with such a crime [possession with intent to distribute cocaine and possessing a firearm in furtherance of a drug trafficking crime] themselves or anything of that nature[?]"—was "too general to elicit responses from the prospective jurors which would indicate a potential bias against individuals charged with a drug offense." *Id.* at 973, 975. Determining that "the district court should have conducted a more probing inquiry into the prospective jurors['] state of mind as it relates to drug-related offenses," we held that the district court had abused its discretion. *Id.* at 975.

We conclude that the district court's question in *Laird* materially differs from the voir dire question at issue in this case. Unlike the question in *Laird*, which we found "too vague to alert a potential juror, who is likely a legal novice, that the questioner is inquiring about their biases or prejudices," *id.* at 975, the question that the district court asked here was specific and clearly intended to inquire as to the prospective jurors' potential bias in favor of any of the listed institutions. In fact, Silvers's issue with the district court's question is that it was *too* specific— focusing only on the Army, the branch of the military implicated in this case, instead of the entire military—not too broad or vague. And Silvers cites no legal authority for the proposition that a district court abuses its discretion by asking a question on voir dire that is too closely tailored to the facts of a case.

Silvers is correct that an adequate voir dire is required to "ensur[e] 'a fair trial by a panel of impartial, "indifferent" jurors.'" *Guzman*, 450 F.3d at 630 (quoting *Irvin*, 366 U.S. at 722). But he is incorrect in asserting that the voir dire questioning in his case was constitutionally inadequate. The district court asked a detailed question about potential jurors' prior involvement with the Army in order to expose any impermissible bias in favor of the victim due to her status as an active-duty member of the Army. That the court's question focused on the particular

branch of the military in which Brittney Silvers served was not an abuse of the district court's broad discretion in conducting voir dire. We therefore affirm the district court.

## C. Constitutionality of Silvers's Mandatory Life Sentence

The final issue that Silvers raises on appeal is whether his mandatory life sentence under 18 U.S.C. § 1111(b) violated the Eighth Amendment's prohibition against cruel and unusual punishment. We review de novo constitutional challenges to sentences, including challenges to the constitutionality of a sentence under the Eighth Amendment. *United States v. Jones*, 569 F.3d 569, 573 (6th Cir. 2009).

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII. "In reviewing Eighth Amendment challenges, this circuit has adhered to the 'narrow proportionality principle' articulated in *Harmelin v. Michigan*." *United States v. Hill*, 30 F.3d 48, 50 (6th Cir. 1994) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 996–97 (1991) (Kennedy, J., concurring)). That principle "requires a defendant to show that the term [of imprisonment] is grossly disproportionate to the crime." *United States v. Potter*, 927 F.3d 446, 454 (6th Cir. 2019) (citing *Ewing v. California*, 538 U.S. 11, 20, 23 (2003) (plurality op.)).

Here, Silvers argues that his mandatory life sentence for first degree murder is "cruel and disproportionate" as applied to the facts of his case. Appellant Br. at 67. But Silvers's argument faces "insurmountable obstacles before this court." *Potter*, 927 F.3d at 454. This is because, as Silver concedes, his argument is foreclosed by our decision in *Hill*. Appellant Br. at 64 ("Silvers acknowledges [*Harmelin*] and [*Hill*], which the Court may read to foreclose his challenge."). In *Hill*, we evaluated the defendant's argument that his mandatory life sentence for a third felony drug conviction violated the Eighth Amendment. 30 F.3d at 50. Applying the "narrow proportionality principle" set forth in *Harmelin*, we compared the circumstances underlying Harmelin's conviction (first offense, simple possession) to those underlying the defendant's conviction (his third felony offense, for conspiracy to distribute, more than 25 times the amount of narcotics attributed to the defendant in *Harmelin* if applying a 100:1 crack to powder cocaine ratio) and determined that "the circumstances underlying [the defendant's] conviction and

sentence are more egregious than those that justified the life sentence imposed in *Harmelin*." *Id.* at 50–51. On that basis, we concluded that the defendant's "mandatory life sentence did not violate the Eighth Amendment." *Id.* at 51.

Applying our reasoning in *Hill* to the case at bar, we conclude that the circumstances underlying Silvers's conviction and sentence—i.e., that Silvers was convicted of the premeditated murder of his estranged wife, as well as the attempted murder of Keaton, domestic violence, and violation of a protection order, among other related crimes—are certainly more egregious than those present in *Harmelin*. Additionally, although we have not specifically held that a mandatory life sentence for first-degree murder is constitutional, many of our sister circuits have. *See, e.g.*, *United States v. Sierra*, 933 F.3d 95, 98–99 (2d Cir. 2019); *United States v. Chavez*, 894 F.3d 593, 609 (4th Cir. 2018); *United States v. LaFleur*, 971 F.2d 200, 211 (9th Cir. 1991); *United States v. Forbes*, 282 F. App'x 324, 325 (5th Cir. 2008) (per curiam).

Silvers argues that we should nevertheless reconsider our holding in *Hill*. Appellant Br. at 64. But "[a] panel of this Court cannot overrule the decision of another panel. The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the same decision or this Court sitting en banc overrules the prior decision." *Salmi v. Sec'y of Health & Hum. Servs.*, 774 F.2d 685, 689 (6th Cir. 1985). *Hill* is a published opinion that neither the Supreme Court nor this court, sitting en banc, has called into question. *Hill* thus binds us here. We therefore affirm Silvers's sentence as constitutionally sound.

## III. CONCLUSION

For the reasons set forth above, we **AFFIRM** Silvers's convictions and sentence.

———————————

## CONCURRENCE

———————————

THAPAR, Circuit Judge, concurring in part and concurring in the judgment.   Victor Silvers murdered his estranged wife on an Army base.   After a jury convicted him, he was sentenced to life in prison without the possibility of parole.   On appeal, he challenges three aspects of his conviction.   The majority is right to reject them all.   But because I would resolve some of the claims differently, I respectfully concur in part and concur in the judgment.

I.

On the night of October 14, 2018, Brittney Silvers was found lying outside her home dying of a gunshot wound.   Brittney was a logistics specialist with the United States Army and lived on Fort Campbell, a military base straddling the border of Kentucky and Tennessee.   Soon after she was shot, Military Police arrived on the scene.   They found a man sitting in a parked car in Brittney's driveway, surrounded by neighbors with their guns drawn.   That man was Victor Silvers ("Silvers"), Brittney's estranged husband.

A grand jury indicted Silvers for first-degree murder under 18 U.S.C. §§ 1111(a), (b).[1] Section 1111 requires the government to show that the crime occurred within the special maritime and territorial jurisdiction of the United States.   18 U.S.C. § 1111(b).   Here, the government alleged that the murder occurred at Brittney's house on 4217 Contreras Court, which was located on the Fort Campbell military base.   Thus, because the military base fell within the special maritime and territorial jurisdiction of the United States, the government could prosecute Silvers.

Before trial, the United States asked the district court to take judicial notice that Brittney's address fell within the special maritime and territorial jurisdiction of the United States. Silvers opposed the motion, arguing that the Sixth Amendment required a jury to find this

---

[1]Silvers also was indicted for attempted first degree murder (of Brittney's boyfriend), domestic violence, violation of a protective order, possession of a firearm by a prohibited person, and the carry, use, and discharge of a firearm during a crime of violence.

jurisdictional element. The court held an evidentiary hearing. There, the government introduced testimony from witnesses in the Army Corps of Engineers and government documents showing the transfer of the land from Kentucky to the United States in 1942. Silvers objected to the authenticity of these documents.

After hearing evidence and arguments from both sides, the court overruled Silvers' objections and found that Brittney's home fell within the special maritime and territorial jurisdiction of the United States. The court made clear that it was taking judicial notice only of the jurisdictional status of the land; it was leaving for the jury to determine whether the events in question actually occurred at 4217 Contreras Court.

Following a six-day trial, the jury found Silvers guilty on all seven counts. The court sentenced him to mandatory life in prison, as required by 18 U.S.C. § 1111(b).[2]

Silvers presses three arguments on appeal. First, that the jury must decide the jurisdictional status of the location where Silvers murdered Brittney. Second, that his mandatory life sentence was unconstitutional. And third, that the district court abused its discretion by refusing to dismiss a juror for bias and failing to inquire about his military service. I address each claim in turn.

## II.

First, Silvers asks us to hold that the Sixth Amendment required a jury to determine that 4217 Contreras Court fell within the special maritime and territorial jurisdiction of the United States. His argument is simple: jurisdiction is an element of the crime for which he was charged, and the Sixth Amendment requires the jury to find all the elements of a crime.

Silvers is right that the Sixth Amendment requires the jury to find all the elements of a crime. *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). But the relevant element of the crime here is that the alleged murder occurred within the special maritime and territorial jurisdiction of the United States. *See* 18 U.S.C. §§ 1111(a), (b). It's a different question,

---

[2]The court also added a mandatory 10-year consecutive term for Silvers' conviction for using a firearm during a crime of violence. *See* 18 U.S.C. § 924(c)(1)(A)(iii).

however, whether the land on which the alleged murder occurred fell within special maritime and territorial jurisdiction.  That's not a required element in the text of § 1111.  Rather, it's a legal question that goes to the jurisdictional status of the land on which the crime allegedly occurred.

So, following the Supreme Court's instructions, I would look to history and tradition to determine who decides factual questions bearing on the jurisdictional status of land.  And history makes clear that the court can make this finding.  Thus, I agree with the majority that the district court could take judicial notice that 4217 Contreras Court fell within the special maritime and territorial jurisdiction of the United States.

A.

Silvers' challenge hinges on whether the judge or jury may decide the jurisdictional status of a given piece of land.  Silvers says the jury; the government says the judge.  As the majority properly recognizes, there's no Sixth Circuit precedent that resolves this dispute. Where, then, should a court turn?

The Supreme Court has told courts to look to historical evidence to determine the scope of the Sixth Amendment's right to a jury trial.  In *United States v. Gaudin*, the Supreme Court emphasized that historical practice gives meaning to that right.  515 U.S. 506, 515 (1995).  And *Gaudin* relied on this history to reiterate that the Sixth Amendment mandates that a jury must find all the elements of a crime to secure a conviction.  *Id.*  So too in *Apprendi v. New Jersey*. There, the Court invoked a "historical foundation" to support its interpretation of the Sixth Amendment.  530 U.S. at 477.  Fast forward another twenty years, and the Supreme Court still uses historical practice to define the contours of the Sixth Amendment.  *Erlinger v. United States*, 602 U.S. 821, 828–32 (2024); *see also id.* at 862–67 (Kavanaugh, J., dissenting).

For good reason, we usually focus on history when dealing with the Constitution.  *See, e.g.*, *Vidal v. Elster*, 602 U.S. 286, 295–99 (2024) (looking to history to examine the interplay of the First Amendment and trademark rights); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022) (same, for the scope of the Second Amendment); *Town of Greece v. Galloway*, 572

U.S. 565, 575–77 (2014) (same, for the Establishment Clause); *Crawford v. Washington*, 541 U.S. 36, 42–50 (2004) (same, for the Confrontation Clause).

Following this consistent command, courts must look to history to determine who can find the jurisdictional status of a piece of land—judge or jury?

B.

History reveals that a judge can determine jurisdictional status without running afoul of a defendant's right to a jury trial.

i.

Both federal and state courts have long taken judicial notice of geographical facts giving rise to jurisdictional status—judicial notice that's akin to whether a particular location falls within special maritime or territorial jurisdiction. Cases demonstrating this principle fall into several categories: judicial notice that land falls within a given jurisdiction, judicial notice of admiralty jurisdiction, judicial notice of a navigable river, and judicial notice of Indian country.

a.

The best example of a court judicially noticing a fact giving rise to a jurisdictional element is *Jones v. United States*, 137 U.S. 202 (1890). In *Jones*, the federal government indicted the defendant for murder on the Caribbean Island of Navassa. How did the United States have the power to try someone for a crime on this piece of land? A law called the Guano Islands Act allowed the president to declare that the United States possessed any island with guano deposits. *See* 48 U.S.C. § 1411. (Guano is bird excrement used to make fertilizer and gunpowder.) The Act asserted federal criminal jurisdiction over all such islands. *Id.* § 1417. And, because there was guano on Navassa, and the President declared the United States possessed it, the government thought it had criminal jurisdiction.

The Supreme Court agreed. 137 U.S. at 211–12. In holding that the Act could confer jurisdiction, the Supreme Court reasoned that "[a]ll courts of justice are bound to take judicial notice of the territorial extent of the jurisdiction exercised by the government whose laws they administer." *Id.* at 214. And the Court described how judges can draw from diverse sources,

including laws, treaties, and proclamations from outside the evidentiary record. *Id.* Thus, the *Jones* Court resolved the jurisdictional status itself through judicial notice, rather than leaving it to a jury. The Court looked at documents showing that the island of Navassa contained guano and actions by the President showing that the United States had claimed authority over Navassa. Based on those sources, the court found federal criminal jurisdiction over the case. *Id.* at 217, 224.

The Supreme Court also took judicial notice of facts giving rise to admiralty jurisdiction. *See Peyroux v. Howard*, 32 U.S. 324 (1833). In *Peyroux*, the question was whether a steamboat in New Orleans fell within the federal admiralty jurisdiction. The dispute boiled down to a factual question about geography: federal admiralty jurisdiction was proper if the water level of the Mississippi River in New Orleans rose and fell with the Gulf's changing tides. *Id.* at 342. The Supreme Court held that it could answer this question through judicial notice. *Id.* Even though the Court cautioned that it normally couldn't take judicial notice of factual questions, the Court explained that it was "bound to take notice of public facts and geographical positions." *Id.* Based on its study of a book called "Stoddard's Louisiana,"[3] the Court satisfied itself that the river level in New Orleans ebbed and flowed with the Gulf's tide. *Id.* at 343. Thus, the Court confirmed that the case fell within the federal admiralty jurisdiction.

To be sure, *Peyroux* is a civil case—and because the court sat in admiralty jurisdiction, the defendant didn't have a right to a jury trial. *See Parsons v. Bedford, Breedlove & Robeson*,

---

[3]"Stoddard's Louisiana" refers to the 1812 book *Sketches, Historical and Descriptive, of Louisiana*, by Major Amos Stoddard. Born in Connecticut, Stoddard fought in the American Revolution. William Willis, *A History of the Law, the Courts, and the Lawyers of Maine* 180 (1863). He then clerked at the Supreme Court of Massachusetts in Boston before opening his own law practice in the town of Hallowell, Maine. *Id.* A man of "fine personal appearance," Stoddard had "more taste for military life than for the quiet pursuit of his profession in a remote country village." *Id.* He rejoined the military, where he distinguished himself as a "man of talents." *Id.* He was killed in 1813 at the Battle of Fort Meigs during the War of 1812. *Id.* Seeking to foster the American public's understanding of Louisiana's "climates, soils and productions, the magnitude and importance of its numerous rivers, and its commercial and other natural advantages," Stoddard published his *Sketches* in 1812. Amos Stoddard, *Sketches, Historical and Descriptive, of Louisiana* vi (1812). In the preface to his work, Stoddard worried that his long period of military service, during which he was "wholly secluded from the literary world," would not bode well for his "literary attempt." *Id.* at viii. He professed modest aims for his book: "I expect not the approbation of scientific men, though I hope to escape their censure. If they cannot think favorably of my genius or erudition, I trust they will at least commend my industry and motives." *Id.* They did. Stoddard would no doubt have been gratified to know that the Supreme Court of the United States treated "[t]he authority of Mr. Stoddard" as a basis for answering questions of federal law. *Peyroux*, 32 U.S. at 343.

3 Pet. 433, 446–47 (1830) (Story, J.). So, it doesn't speak directly to whether a judge may determine the jurisdictional status of land in a criminal case. Nevertheless, *Peyroux* teaches that federal courts have the authority to judicially notice geographical facts that form the basis of the court's jurisdiction. *See* 32 U.S. at 343.

What's more, judicial notice didn't end at the coastline. Courts have long taken judicial notice of what lands constituted "Indian country" in federal criminal prosecutions. Early federal statutes, such as the General Crimes Act of 1817, conferred federal jurisdiction over certain crimes that occurred in "Indian country." *See* 18 U.S.C. § 1152. But Congress didn't provide a clear definition of that term, so "the courts then proceeded to define Indian country judicially." David H. Getches et al., *Cases and Materials on Federal Indian Law* 349 (1979).

In *Donnelly v. United States*, for example, the Supreme Court determined that the United States had jurisdiction over a murder that occurred on an Indian reservation in northern California. 228 U.S. 243 (1913). The defendant had argued that the land on which the murder occurred wasn't Indian country. *Id.* at 268. But the Court held otherwise. *Id.* at 268–69. Thus, the jurisdictional status of the land wasn't a question for the jury. *See also United States v. Pelican*, 232 U.S. 442, 451–52 (1914) (reversing district court's determination that the land in question was not Indian country).

Other courts did the same. For example, in *Beebe v. United States*, the defendant was indicted for murder in Indian country. 11 N.W. 505 (Dakota 1882). The Supreme Court of the Territory of Dakota (an Article I court) declared its intention to "take judicial notice of Indian reservations, and of public leading proclamations affecting matters relative to its jurisdiction." *Id.* at 510. In doing so, the court relied on "authentic public documents." *Id.* Thus, the court did not submit the jurisdictional status of the land as a question to the jury.

So too in *United States v. Leathers*, 26 F. Cas. 897 (D. Nev. 1879) (No. 15,581). There, the jury found the defendant guilty of introducing liquor into Indian country and trading without a license. *Id.* at 897. After the jury found a series of "[s]pecial issues of fact," the government moved for judgment from the court. *Id.* In so doing, the court had to determine that the land on which the jury found the crime to have occurred was Indian country and thus subject to federal

jurisdiction. *Id.* The court concluded that it was. *Id.* at 900. This division of findings among court and jury matches the division in Silvers' case, albeit in reverse order: the jury first found that the crime occurred at a given place, and the court then determined that this place fell within Indian country.[4]

In sum, all these cases show that federal courts routinely determined the jurisdictional status of a piece of land.

b.

State cases paint a similar picture: courts consistently took judicial notice of facts giving rise to jurisdictional elements.[5]

The best example of a state court taking jurisdictional notice of the status of land is *State v. Wagner*, 61 Me. 178 (1873). There, the state of Maine indicted a defendant for murder on an island called Smutty Nose. The defendant objected to the jurisdiction of the Maine state court, since he claimed the state hadn't shown that Smutty Nose was actually located in Maine. *Id.* at 181–82. Moreover, just as Silvers does here, the defendant argued that the jurisdictional status of a relevant piece of land was a jury question. *Id.* at 183. The Maine Supreme Court disagreed, holding that jurisdiction was a question for the judge. *Id.* at 184. The court observed that the "question of jurisdiction in this case turned entirely upon the construction of the ancient charters and grants," which was not "a matter for the jury to determine." *Id.* Instead, the construction of those documents was "purely a question of law for the court." *Id.* Why? Because "once settled," their meaning "must be deemed settled forever, and not subject to the varying verdicts of successive juries whenever a person charged with a crime sees fit to claim to throw in a denial

---

[4]This division continues to this day in the Indian country context. *See, e.g.*, *United States v. Jackson*, 853 F.3d 436, 438 n.2 (8th Cir. 2017) ("The court determines whether a particular piece of land is in Indian country; the jury then decides whether the crime in fact occurred on that land."); *United States v. Roberts*, 185 F.3d 1125, 1139 (10th Cir. 1999) (same); *United States v. Stands*, 105 F.3d 1565, 1575 (8th Cir. 1997) (same).

[5]It's true that these state cases weren't interpreting the Sixth Amendment's right to jury trial, which the Supreme Court only incorporated against the states in 1968. *See Duncan v. Louisiana*, 391 U.S. 145 (1968). But early state practice can still be relevant as to the scope of the Sixth Amendment. The constitutions of the early states all required some form of jury trial. *Id.* at 153. And a jury trial was among the most precious rights in early America. *Id.* at 151. *See also Parsons*, 3 Pet. at 446 ("The trial by jury is justly dear to the American people" and "secured in every state constitution in the union.") (Story, J.). So, early state practices are still relevant to how the Sixth Amendment would have been understood.

of jurisdiction." *Id.* at 185. Unsurprisingly, the impracticability of leaving these inquiries to the jury mirrors the district court's reasoning here.

New York's highest court took a similar view. *See People v. Godfrey*, 17 Johns. 225 (N.Y. 1819). In *Godfrey*, a defendant argued that New York state courts lacked jurisdiction over his indictment for murder in Fort Niagara, which the defendant claimed fell within federal jurisdiction. The court combed through historical documents and treaties to conclude that New York had jurisdiction. *Id.* at 230–33. This wasn't a question for the jury to decide. Once the court was "perfectly satisfied" that the state had jurisdiction, "nothing remain[ed] but that judgment be passed" upon the defendant. *Id.* The court could take judicial notice of the land's status; the court didn't need to leave the question for the jury.

State courts likewise took judicial notice of facts relating to river navigability. In *Commonwealth v. King*, a defendant was indicted in Massachusetts for running a steamboat without a license on waters within the state's jurisdiction. 22 N.E. 905, 905 (Mass. 1889) (syllabus). But the state only had jurisdiction if the river—here, the Connecticut River—wasn't navigable where the defendant operated his steamboat. *Id.* at 906. If the river was navigable, by contrast, then it would fall within the federal admiralty jurisdiction—not Massachusetts' jurisdiction. The court held that the lower court might take judicial notice that the river wasn't navigable. *Id.* "It is well known," explained the court, that "the waters of the Connecticut river, at the place where it is alleged that the defendant's steam-boat was employed, can be used by vessels only for" intra-state transportation. *Id.* Those waters were thus "not within the maritime jurisdiction of the United States." *Id.* Nowhere did the court say that a jury would have to decide the question of navigability (and thus jurisdictional status). Rather, the Justices of the Massachusetts Supreme Judicial Court were free to make this determination for themselves, without violating the defendant's state constitutional right to a jury trial.

All told, courts throughout history have taken judicial notice of facts establishing the jurisdictional status of given geographical features. The Supreme Court long ago summarized this trend: "[C]ourts of the United States take judicial notice of the ports and waters of the United States where the tide ebbs and flows, of the boundaries of the several States and judicial districts, and of the laws and jurisprudence of the several States in which they exercise

jurisdiction." *Brown v. Piper*, 91 U.S. 37, 42 (1875). A leading 19th century evidence treatise agreed: "Courts also take notice of the territorial extent of the jurisdiction and sovereignty, exercised *de facto* by their own government." Simon Greenleaf, 1 A Treatise on the Law of Evidence ch. 2, § 6 (3d. ed. 1846). This mass of evidence confirms what the majority holds.

c.

Finally, there's one more 19th-century Supreme Court case that discusses judicial notice: *United States v. Jackalow*. 66 U.S. 484 (1861). While *Jackalow* teaches that the jury must find venue in a criminal case, it says nothing about the Sixth Amendment and the jurisdictional status of land.

In *Jackalow*, the defendant was charged in federal court in New Jersey with piracy on board a vessel in the Long Island Sound. *Id.* at 485. Why a New Jersey federal court? Under an 1820 act, any defendant who committed robbery on the "high seas" outside the boundaries of a state could be tried in the federal district court in which he was found (here, that was New Jersey). *See* "An act to protect the commerce of the United States, and punish the crime of piracy," Pub. L. 16-113, § 3, 3 Stat. 600 (1820). Thus, the key question was whether, at the time of the alleged offense, the ship's location was within the boundaries of a state. *Jackalow*, 66 U.S. at 486. The ship in question here was somewhere in the Long Island Sound, between New York and Connecticut. *Id.* at 487.

The Court held that the jury had to determine whether this location fell within a state. The Court began by stating that "the boundary of a State, when a material fact in the determination of the extent of the jurisdiction of a court, is not a simple question of law." *Id.* Thus, a jury should find the relevant facts. As the Court put it: the "ascertainment" of the location's geographical status "belongs to the jury." *Id.* "All the testimony bearing upon this question, whether of maps, surveys, practical location, and the like, should be submitted to them under proper instructions to find the fact." *Id.* at 487–88.

Those few sentences appear to support Silvers' argument that a jury must determine the jurisdictional status of a piece of land. But *Jackalow* is about *venue*, not jurisdiction.

Remember that the relevant question in *Jackalow* was whether the defendant committed the crime outside the boundaries of a state. If so, Congress had prescribed that he could be tried in the state in which he was caught. What gave Congress authority to do so? The Venue Clause of the Constitution. This provision mandates that when a defendant commits an offense outside any state, "the trial shall be at such place or places as the Congress may by law have directed." U.S. Const. art. III, § 2, cl. 3. Thus, the *Jackalow* Court asked whether, "in view of this provision of the Constitution," the defendant committed his offense outside of any state. 66 U.S. at 486. That is, the key question was the proper *venue* for the trial. The Court held that the judge had to submit the issue of venue to the jury rather than determine it himself. *Id.* at 488.

This reading of *Jackalow*—as a venue rather than a jurisdiction case—coheres with subsequent caselaw. It's black-letter law that the government must prove venue to the jury by a preponderance of the evidence. *See, e.g.*, *United States v. Petlechkov*, 922 F.3d 762, 770 (6th Cir. 2019); *see also* 2 Charles Alan Wright & Arthur Miller, *Federal Practice & Procedure* § 307 (4th ed. 2024). And courts have long understood *Jackalow* to be a case about venue, not jurisdiction. *See, e.g.*, *Smith v. United States*, 599 U.S. 236, 250 (2023) (calling *Jackalow* a case about "venue error"); *United States v. Perez*, 280 F.3d 318, 330 n.8 (3d Cir. 2002) (describing *Jackalow* as a case about whether "venue existed"); *United States v. Matos-Luchi*, 627 F.3d 1, 14 (1st Cir. 2010) (Lipez, J., dissenting) (same). Perhaps that's why, in the subsequent Guano Islands Act case, *Jones v. United States*, the Supreme Court felt free to disregard *Jackalow* when it held that "[a]ll courts of justice are bound to take judicial notice of the territorial extent" of legal boundaries. 137 U.S. at 214.

The distinction between jurisdictional status and venue also makes sense from first principles. The jurisdictional status of the land relates to the authority of a court to hear a particular case. 2 *Wharton's Criminal Procedure* § 10:1 (14th ed. 2023). That's a quintessential legal question: Does the law give the court authority? Venue, however, relates to the proper place for trial *within* a given jurisdiction. *Id.* In other words, among the courts that have legal authority over the defendant, the proper venue depends on the geographical location of the crime. *Id.* That's a factual question that depends on the site of the crime—and thus is a natural fit for

the jury to determine. The legal issue of the jurisdictional status of the land, by contrast, is a better fit for the court to adjudicate.

In sum, *Jackalow* is a case about venue, not jurisdiction. It therefore has no bearing on whether courts have traditionally submitted the question of the jurisdictional status of land to the jury.

\* \* \*

In conclusion, historical practice supports the majority's conclusion that the district court could take judicial notice that 4217 Contreras Court fell within the special maritime and territorial jurisdiction of the United States.

III.

Silvers also argues that the imposition of a mandatory life sentence is unconstitutional under the Eighth Amendment's prohibition on "cruel and unusual punishments." U.S. Const. amend. VIII. He claims that his punishment is "disproportionate and cruel." Appellant Br. at 64. He is wrong.

The Supreme Court has told us that the Eighth Amendment contains a "narrow proportionality principle" that prohibits a term of imprisonment from being "grossly disproportionate" to the crime. *United States v. Potter*, 927 F.3d 446, 454 (6th Cir. 2019) (citing *Ewing v. California*, 538 U.S. 11, 20 (2003) (plurality)). And, as Silvers acknowledged in his briefing, two relevant cases using the proportionality framework foreclose his challenge. In one of those cases, the Supreme Court upheld a mandatory life sentence for a defendant convicted of possessing 672 grams of cocaine. *Harmelin v. Michigan*, 501 U.S. 957, 961, 996 (1991). And in the other, *United States v. Hill*, our circuit upheld a mandatory life sentence for a third felony drug conviction. 30 F.3d 48, 50–51 (6th Cir. 1994). The present facts, which involve Silvers' premeditated murder of his estranged wife and attempted murder of her boyfriend, are far more egregious than the crimes in those cases. Thus, precedent makes clear that Silvers' sentence isn't grossly disproportionate to his heinous crime.

To be sure, as Justice Scalia has made clear, the "proportionality principle" has no basis in the text, history, or tradition of the Eighth Amendment. *See Harmelin*, 50 U.S. at 965 (opinion of Scalia, J.). And as judges, we're not authorized or equipped to weigh what sentence is proportionate to the severity of a given crime. *Cf. Nat'l Republican Senatorial Comm. v. FEC*, 117 F.4th 389, 400 (6th Cir. 2024) (en banc) (Thapar, J., concurring) (emphasizing that judicial balancing tests "sit[] in tension with the historically derived nature of our constitutional rights" and "strain[] courts' institutional competence"). Rather, the Eighth Amendment "leaves the unavoidably moral question of who 'deserves' a particular nonprohibited method of punishment to the judgment of the legislatures that authorize the penalty." *Miller v. Alabama*, 567 U.S. 460, 504 (2012) (Thomas, J., dissenting) (citation omitted). It's Congress's job—and not ours—to determine the appropriate length of the sentence for the murder Silvers committed. But the Supreme Court has interpreted the Eighth Amendment otherwise. And under that framework, I agree with the majority that Silvers' punishment isn't grossly disproportionate to his crime.

IV.

Finally, I agree with the majority's resolution of Silvers' jury bias claim. The juror at issue honestly answered the district court's questions during voir dire. And the district court did not abuse its discretion by failing to inquire about military service more generally.

\*   \*   \*

I thus respectfully concur in the majority's analysis of the jury bias claim and concur in the judgment as to the remaining claims.